GEORGE WESTON et al., Appellants, v. MARY HANSON et al.

### Division Two, May 19, 1908.

1. **WILL: Capacity: Tests.** The tests of the testator's capacity to make a will are that he had sufficient intelligence to know what property he owned, what disposition he was making of it, and all the persons who reasonably came within the range of his bounty, and to transact his ordinary business affairs.

2. ——: ——: ——: **Brutality Towards Wife.** Testator's brutal treatment of his wife, that led her to sue him for a divorce, which the evidence showed he desired her to get, in order that he might be rid of her and be free to associate and live with another woman, is not one of the tests of testamentary capacity. A man may be unkind, unfaithful and brutal in his treatment of his wife, and yet have capacity to make a will.

3. ——: ——: **Unnatural Will.** Two or three days prior to making the will testator divided his property about equally with his wife, who had just obtained a divorce from him, and in consideration of the property conveyed and given to her she relinquished her dower in his remaining property. Thereupon he went alone to a lawyer, gave him a description of all his property and specific directions as to how he wanted it disposed of, gave the names and residences of his children, stated he wanted the headstone to his grave to show his name, and date and place of birth, and the date and place of death, and the reasons why he gave his wife nothing, and the will was drawn in exact accordance with his wishes, and the three witnesses testified that at the time he was of sound mind. His wife, who is not a party, when asked if he was of sound mind, at first evaded the question, and finally answered that she supposed he was. A

physician testified that when he first knew him he was a man of bright and talkative disposition; that he afterwards had chronic ulcers on his legs, due to imperfect circulation attendant upon approaching old age, and urinary calculus, which made him irritable and from which he suffered severe pain, and that he became morose, quiet, and approached a hypochondriac state. He was shown to have been a forceful man, had been trusted with responsible business, had accumulated considerable property and managed it himself, and by his will disinherited his children and gave all his property to a favored niece of his wife, with whom he had become immorally intimate before his wife secured the divorce. *Held*, first, that, owing to the unnatural disposition of his property, the burden was on the proponents to establish the validity of the will; *second*, that he had a right to dispose of his property as he wished, even to disinheriting his children, if he had capacity to make a will; *third*, there was no evidence whatever that he was incapacitated to make a will; and, *fourth*, the will itself bears on its face proof of the testator's capacity.

4. ———: **Undue Influence: Mistress as Sole Devisee.** A will by which an old testator disinherits his children and gives all his property to a young mistress, cannot be said to be the result of undue influence on her part, in the absence of any evidence that she knew the will had been made, that she ever talked with him about making a will, or that she ever exerted her influence over him to induce him to make her his devisee.

5. ———: **Acquirement of Property.** It is immaterial how testator acquired the property disposed of by his will, whether with the assistance of his disinherited children or not.

Appeal from Jackson Circuit Court.—*Hon. Hermann Brumback*, Judge.

AFFIRMED.

*O. A. Lucas, Allen & Allen* and *J. J. Williams* for appellants.

(1) There was substantial evidence that testator was of unsound mind at the time of the execution of the will in question, and that he did not have mental capacity to execute said will, and this case should have gone to the jury upon that issue. Knapp v. Trust Co., 199 Mo. 664; Hill v. Boyd, 199 Mo. 448; Meier v.

Buchter, 197 Mo. 88; Elliott v. Welby, 13 Mo. App. 19; Sehr v. Lindemann, 153 Mo. 289; Fulbright v. Perry Co., 145 Mo. 432; Muller v. St. Louis Hospital Assn., 73 Mo. 242, 5 Mo. App. 390; 1 Clevenger on Med. Jur. on Insanity, pp. 347, 348; Southworth v. Southworth, 173 Mo. 73; Rood on Wills, secs. 122, 123; 1 Redfield on Wills (4 Ed.), p. 537; Harrell v. Harrell, 1 Duvall (Ky.) 204; Cassoday on Wills, sec. 460; Ballentine v. Proudfoot, 62 Wis. 220; Walls v. Walls, 99 S. W. 969. (2) There was substantial evidence that testator sustained immoral relations with Mary Hanson, and was under her influence, and that she acquired and exerted such undue influence over the mind of the testator at the time of the execution of the will, that she was made practically sole beneficiary, and upon that issue this cause should have been submitted to the jury. Bush v. Bush, 87 Mo. 486; Gorden v. Burris, 141 Mo. 612; Meier v. Buchter, 197 Mo. 91; Knapp v. Trust Co., 199 Mo. 663; Hill v. Boyd, 199 Mo. 449; Mowry v. Norman, 103 S. W. 15; Sunderland v. Hood, 13 Mo. App. 239; Sunderland v. Hood, 84 Mo. 293; Dean v. Nealy, 41 Pa. St. 312; King v. Gilson, 191 Mo. 327; Bradford v. Blossom, 190 Mo. 143; Roberts v. Bartlett, 190 Mo. 703; Hughes v. Rader, 183 Mo. 630; Dausman v. Rankin, 189 Mo. 707. (3) Where the testator lived in a state of concubinage with defendant, the chief beneficiary, both before and after the will was made, and up to his death, such acts were suspicious circumstances and constituted evidence, along with other facts and circumstances in this cause, of undue influence, upon which this cause should have been submitted to the jury. Sunderland v. Hood, 13 Mo. App. 236; Sunderland v. Hood, 84 Mo. 293; Dean v. Negley, 41 Pa. St. 312; Shipman v. Furniss, 69 Ala. 555; 29 Am. and Eng. Ency. Law (2 Ed.), 130, 131; Smith v. Henline, 174 Ill. 196; Reichenbach v. Ruddach, 127 Pa. St. 564; McClure v. McClure, 86 Tenn. 173. (4) That Mary Hanson exercised undue influence over the testator should

be presumed as a matter of law, and the burden should be on proponents to free her of this presumption. Barkley v. Cemetery Assn., 153 Mo. 315; Roberts v. Bartlett, 190 Mo. App. 702; Sunderland y Hood, 13 Mo. App. 232, 84 Mo. 293; Maddox v. Maddox, 114 Mo. 46. (5) The court erred in excluding portions of the depositions of Ellen Mills, and John Mills, and in excluding other competent, relevant and material evidence. Bridwell v. Swank, 84 Mo. 472; Carl v. Gabel, 120 Mo. 297.

*Milton Moore* and *C. O. Tichenor* for respondent Mary Hanson.

(1) There is neither substantial nor even unsubstantial evidence to show that Weston did not have sufficient capacity to make a will on June 12, 1899. Archambault v. Blanchard, 198 Mo. 425; Wood v. Carpenter, 166 Mo. 487; Jayne v. Trustees, 192 Mo. 130; Catholic University v. O'Brien, 181 Mo. 91; Brinkman v. Rueggesick, 71 Mo. 556; Von de Veld v. Judy, 143 Mo. 363. Mere opinions of witnesses, unaccompanied by any testimony showing any particular act, or fact, evidencing incompetency, do not make out a case of incompetency when the testimony shows that the testator knew what he was doing and to whom he was giving his property. Southworth v. Southworth, 173 Mo. 73; Leach v. Burr, 188 U. S. 515. (2) There was no evidence of undue influence in the case. Lorts v. Wash, 175 Mo. 505; Kischman v. Scott, 166 Mo. 226; Campbell v. Carlisle, 162 Mo. 646; McFadin v. Catron, 138 Mo. 218; Martin v. Bowdern, 158 Mo. 393; Riley v. Sherwood, 144 Mo. 366. Remarks of Mary not in hearing of testator do not tend to show undue influence. Garland v. Smith, 127 Mo. 583; Defoe v. Defoe, 144 Mo. 465. (3) "He may have formed an attachment for strangers stronger than that for his children, which should not exist, but the law does not prevent him from gratifying his whims or caprice,

in the testamentary disposition of his property."
Sunderland v. Hood, 84 Mo. 293; Sehr v. Lindemann,
153 Mo. 292; Moore v. Moore, 67 Mo. 193; Berberet v.
Berberet, 131 Mo. 411; Maddox v. Maddox, 114 Mo. 47;
Schierbaum v. Schemme, 157 Mo. 12. We do not under-
stand that Judge LAMM, in Meier v. Buchter, 197 Mo.,
entertains a different opinion. The opinion may show
that he thinks that the statutes of this State should be
changed so as to put limitations upon the power of dis-
position by will. He says, in effect (p. 87), that where
there is substantial evidence of undue influence, unsub-
stantial evidence like disinheriting an heir 'may be
heard to aid it. In other words, two pieces of unsub-
stantial evidence do not make substantial evidence—
add unsubstantial evidence to unsubstantial evidence
and the result will be unsubstantial evidence—but if
there is substantial evidence which will sustain a ver-
dict, then unsubstantial evidence, like disinheritance,
illicit intercourse, etc., is proper to add to the proba-
bility of the substantial. See, also, on the subject of
undue influence, Berger v. Fevre, 186 U. S. 124. (4)
The reasoning in the cases just quoted from applies to
cases where illicit intercourse has been shown between
testator and beneficiary prior to the making of the
will. In its nature it ranks as unsubstantial evidence,
but it is admissible where there is substantial evidence
of undue influence. A man can will or deed to his mis-
tress because the statute does not prohibit it. The law
does not require a grantor or testator to be a virtuous
man in order to make a deed or a will—the law does not
require a woman to be virtuous in order to take title
by deed or will. Sunderland v. Hood, 84 Mo. 297;
Matter of Mondorf, 110 N. Y. 456; Monroe v. Barclay,
17 Oh. St. 317; O'Neal v. Farr, 1 Rich. Law 84; Dickie
v. Carter, 42 Ill. 377. The brief of appellants cites
Dean v. Nealy, 41 Pa. St. 312. This case is commented
on in Sunderland v. Hood, supra. The latest utter-
ance on this subject by the Supreme Court of Penn-

Weston v. Hanson.

sylvania will be found in Lewis' Estate, 210 Pa. St. 599. See, also, In re Middleton's Will (N. J.), 59 Atl. 454. (5) Kindness on the part of a legatee or devisee towards testator is not undue influence, even though they are not related. Campbell v. Carlisle, 162 Mo. 646; Kischman v. Scott, 166 Mo. 226; Mackall v. Mackall, 135 U. S. 167; Norton v. Paxton, 110 Mo. 466. (6) How testator got his property, is not an issue in this kind of suit. Crossan v. Crossan, 169 Mo. 631; Ormsby v. Webb, 134 U. S. 65; Couch v. Gentry, 113 Mo. 257; Glover v. Ins. Co., 130 Mo. 186; Norton v. Paxton, 110 Mo. 467.

BURGESS, J.—This is a suit to set aside the will of Thomas Weston, deceased, on the grounds of testamentary incapacity, and undue influence on the part of defendant, Mary Hanson. The contestants are the children and lawful heirs of the testator. By the terms of the will in controversy, dated June 12, 1899, the entire property of the testator, amounting in value to about $15,000, is given to the defendant Mary Hanson, with the exception of one dollar bequeathed to each of the plaintiffs. A demurrer to the evidence was sustained by the court, and the jury, by mandatory instruction of the court, returned a verdict sustaining the will. Judgment was entered accordingly, from which judgment, after ineffectual motions for a new trial and in arrest, plaintiffs appeal.

Thomas Weston, by birth an Englishman, died in February, 1904, at the age of about seventy years. He first met the defendant, Mary Hanson, in England, while over there with his wife and one of his daughters. The young woman was a niece of his wife, and about twenty years of age. From the first he showed a marked affection for the young woman, and she apparently for him. He again visited England in 1895, and brought Miss Hanson to this country upon his return, and she stopped at his home in Kansas City for five

months, when she went to work as a servant girl for Major Jones.

The evidence for the contestants, which is very voluminous, tends to show that before the coming of Mary Hanson the testator was kind to his family, and provided well for them, but that after she came, his conduct and bearing toward his family began to change. He seemed to care far more for the society of Mary Hanson than for that of his wife or daughter, Mary, who were the only members of his family then living with him; and he treated his wife with great disrespect, repeatedly cursing her and applying to her the vilest epithets, such as "old bitch," "she-devil," etc. He demanded that his wife get a divorce from him, and one witness testified that the testator offered him fifty dollars upon condition that he, witness, would cause some trouble in the testator's family which might bring about a divorce proceeding. Once in the presence of the Hanson girl, he beat, choked and cursed his wife, while the girl did nothing to restrain him. So harsh and cruel became his treatment of his wife, and so pronounced his attentions to the defendant, that his wife finally sought for a divorce and secured the same on June 8, 1899. Four days afterwards he made the will in question. The day after the divorce was obtained, he conveyed part of his property, by deed, to his former wife, and she relinquished her dower interest in the remainder of his real property. A former will of the testator, dated November 10, 1893, was introduced in evidence. By that will he left all his property to his wife and children. The evidence shows that the testator was a powerful man physically, and had been a hard worker most of his life, was shrewd in business, and possessed considerable property. He owned five houses on Central street, Kansas City, in one of which he lived; also two farms, comprising 110 acres, within a few miles of Kansas City. Near the corner of Wyandotte and 39th street, Kansas City, about a block

from his residence, he owned a large lot which he turned into a vineyard, and on this piece of ground he built for himself a little house which was called the grapery. This cottage, it appears, was a favorite resort of Mr. Weston and the defendant, Mary Hanson. The girl worked as a servant for different families, not staying long in any place, and spent most of her evenings at the testator's house, he usually accompanying her on her return to her employer's house. She was employed for a time by a Mr. Lee, whose home was close to the lot in which was the little cottage referred to, and she was frequently seen going into this cottage, one witness testifying that she saw Mr. Weston and Mary Hanson coming out of said cottage about twelve o'clock one night, some months before Mrs. Weston obtained the divorce, and the evidence was that they were a great deal together.

The deed from Mr. Weston to his divorced wife, and which was dated June 9th, 1899, was introduced in evidence. For a recited consideration of $6,000 it conveys to her, her heirs and assigns, lots thirteen, sixteen and seventeen and part of lot fourteen, in Arnold's Re-survey of Cross's Addition to Westport, now a part of Kansas City, Missouri. In addition to this deed, Mrs. Weston testified that the testator also gave her $700 in money. On the same day this deed was executed Mrs. Weston gave to the testator a quit-claim deed to lots four, five, fifteen and part of lot fourteen in said Addition to Westport, now a part of Kansas City, also to two farms in Jackson county, Missouri, comprising about 110 acres. This latter deed was made by Mrs. Weston for the purpose of relinquishing her dower interest in the real property described, and which was owned by the testator.

The question was asked Mrs. Weston if she believed her husband knew what he was doing at the time he executed the deed to her. She replied that she did not know, and didn't know whether he was in his right

mind or not.   Being asked if she thought he knew enough to take the quit-claim deed relinquishing her dower in the rest of his property, she answered, "I suppose he did."

Mrs. Weston further testified that prior to 1895, when Mary Hanson came over from England with Mr. Weston, the relations existing between the testator and his family were all right, but that after Miss Hanson came, the testator's bearing and conduct towards her and the children changed; that he wouldn't allow her to do anything for him, and that Miss Hanson did it all; that the testator had ulcers on his legs which he would allow no one to bandage or dress except the defendant; that he told his children to stay away from the house and that he didn't want them there; that he treated Miss Hanson well, and gave her money; that Miss Hanson stayed with them five months when she first came over, and then went to work as a servant for a Major Jones, and afterwards for a Mr. Lee.

"Q.   Did you ever see her and Mr. Weston together at any time, or going out together, while she was at your house or while she was living at other places?  A.  Yes, sir.

"Q.  Well, when and where?  A.  Well, she used to go out to the farm and different places.

"Q.  Would you see them often or otherwise?  A. Very often, sir.

"Q.  Would they come back the same day?  A. No, sir.  Sometimes they would come back the same day, and sometimes they would stay a week.

"Q.  What, if anything, did you ever see her doing to Mr. Weston?  A.  She used to fix his leg and do everything for him that had to be done.  Of course, he wouldn't let me do anything for him.

"Q.  Go ahead, and state anything else you ever saw them doing?  A.  While he was laying sick in bed one day she came down from Mr. Lee's and she lifted up the sheet and kissed him.  I saw her do that.

"Q.  State anything else, Mrs. Weston, that you recall of their actions towards each other; what was done or what they did?  A.  Well, they was always together.  I never knew anything else when she was there.  He used to go out with her at night and he used to stay until a late hour and never come in, and I used to lay down on the little couch at the side of the door to hear when they come in, for fear I should not hear him.  He used to try the door very gently.  I always stayed up until he came in, and I used to lay on that couch so I could hear when he came to the door, so that I never scarcely went to sleep; and he said, 'Why don't you go to bed?'

"Q.  Did you ever see them at any other time go to this cottage in the vineyard?  A.  Yes, sir, I saw them go often.

"Q.  Now, do you know how many times you ever saw them go into that cottage?  A.  No, sir; but I know they went very often; they were there mostly every night; I know that.

"Q.  Was that before or after the divorce was obtained?  A.  Before.

"Q.  Did you ever go away from home and leave them there at the house?  A.  Yes, sir, sometimes.  I had to go to town to my boys and get what I had to have.

"Q.  When you came back what did you find, if anything?  A.  Well, I have found that the bed would be made over from what I made it up at different times.

"Q.  State what the condition of the house was at any time you went back there, as to being open or closed?  A.  When I went down town one day, I hadn't been down but about an hour and a half, and when I came back the door was fastened.

"Q.  Who unlocked it so you could get in finally?  A.  Mary Hanson.

212 Sup—17

"Q. Who was there when you got in there? A. Mr. Weston.

"Q. And who else? A. No one.

"Q. Did you ever see them together, Mrs. Weston, and if so, what their conduct was towards each other? A. Yes, sir. Whenever they would be sitting there on the sofa, they always sat together taking hold of hands."

The witness further testified that Mr. Weston asked her how much she "would take of the property to go and get a divorce;" that he cursed her, grabbed her by the throat and choked her, and threw her across a stool that was in the room; that this was done in the presence and hearing of Mary Hanson; that one day she asked him for some money, and he answered, "You will never have any more money from me;" that she had no money from him for three years thereafter, and she was compelled to wear her daughter's old shoes.

Several witnesses testified to having seen Mr. Weston and Mary Hanson numerous times driving together, and out visiting at his farms. J. J. Sechrist lived on a farm adjoining Mr. Weston's lands, and Mr. Weston and Miss Hanson visited at his home. One time, while there, he saw Miss Hanson with her head on Mr. Weston's bosom, and "saw her touching his whiskers." Mrs. Sechrist testified that she saw them "sitting right close to each other, early and late together," and noticed that he was "looking real loving to be such an old man:" that she often met him going and coming between the city and farm, and "he always had this woman with him."

Mary Schmidt, daughter of a man who lived on one of Mr. Weston's farms, testified that she saw the testator and the defendant often at the place; that Miss Hanson was very loving with him, and that on one occasion, when Miss Hanson soiled her dress while visiting at their house, she remarked to witness, "I don't

care; uncle will buy my dresses; everything uncle has got I will get."

Richard Weston, a nephew of the testator, lived on one of the farms, and testified at the trial that he saw the testator and Miss Hanson at the farm as often as two or three times a week, and that they sometimes stayed over night; that there was a tool house or workshop on the farm in which was a bed and some furniture, and that Mr. Weston slept there and kept the key in his possession. Witness would not say where Miss Hanson stayed, but he saw her with Mr. Weston mornings and evenings at his house and about the farm. He once saw Miss Hanson sitting on the old man's lap and kissing him. On another occasion he heard Miss Hanson remark to his wife, "My uncle will buy me anything; I can get anything I want from my uncle." Witness further said that before Miss Hanson came to the testator's home the family seemed to be getting along harmoniously, but that soon after she came he noticed that the testator would not speak to Mrs. Weston; that the testator told him that he was determined to get a divorce from that "old bitch," meaning Mrs. Weston; that he asked him (witness) to "start the proceedings towards a divorce," and that he would give him fifty dollars for so doing; that on another occasion testator said to him that "before he seen his children get anything he would see hell froze over."

William A. Weston, a son of the testator, testified that he lived in a house of his own in Kansas City; that one day in the year 1897, while visiting at his father's house, he overheard Miss Hanson remark to his father that she didn't like to see him (witness) around there, and heard her ask Mr. Weston to tell witness to keep away from there; that thereafter he noticed that his father was "kind of chilly" towards him; that he once saw Miss Hanson hugging his father in the barn, and on another occasion discovered her sitting on his father's knee at the house.

Ellen Mills, a niece of the testator, testified that she came over from England in 1896, and stopped a few weeks at Mr. Weston's house, Miss Hanson being there at the same time; that Miss Hanson and Mr. Weston were together a great deal; that she would sit on his lap, caress him and comb his hair and beard; that the girl would dress and bandage his leg, and he would not allow his wife near him; that when Mr. Weston was troubled much with his leg he would rub his head and pace to and fro on the floor and his eyes would be starting out of his head, and he would say, "This damn thing will send me crazy;" that one day, in a conversation with witness relative to his wife and property, he said, "She thinks she will get it all, but she shall not have one G— d— cent of it, and I will cut them off without a dollar—Polly will get it; she has been good to me."

Mrs. Williamson, a neighbor of Mr. Weston, testified that the testator, in the presence of Miss Hanson, spoke to witness one day with reference to selling his property on Wyandotte street; that he said, "I can't get my price for it," and that Miss Hanson said, "I would sell it for whatever I could get for it, and keep the children from getting that much."

There was also evidence to the effect that after Mrs. Weston was divorced from the testator, he moved into another house near by, and that Miss Hanson soon afterwards quit working for others and stayed and slept in the same house; that afterwards Mr. Weston and Miss Hanson removed to Rosedale, and that they lived together in the same house for about two years, until he died.

Frank M. Dickinson, custodian of the safe deposit vaults of the New England National Bank, at Kansas City, testified that Weston, on June 13, 1899, rented a box in these vaults, and signed a contract therefor; that some time afterwards Miss Hanson signed the contract with him; that it was arranged in this way so that she

should have a key and access to the box along with Weston. Witness did not know whether she actually had the key or not, and he did not remember ever having seen her go into the vault.

Mr. Getman, administrator of the Weston estate, testified that he went to the box officially, examined its contents and found in it a warranty deed from Weston to Miss Hanson, properly acknowledged, dated May 3, 1902, to his farm lands in Jackson county, and another deed from Weston to Mary, dated April 26, 1902, to a tract of land in Kansas; also a bill of sale of testator's personal property at Rosedale, including notes owing him by others; also a certificate of deposit by Weston, issued by American National Bank of Kansas City, Missouri, for $5,500, payable to the order of "self or Mary Hanson," dated November 11, 1903. There was also in the box a certificate of deposit for $1,500, payable to Weston individually; also $670 in cash and a note for $100 payable to Weston.

Dr. Ayers, who became testator's physician in 1888 and continued so, off and on, to the time of his death, testified that Weston had chronic ulcers on his legs, and that he also had urinary calculus which caused him excruciating pain and very great illness at times.

"Q. Well, was there any change in any way in him, and if so, when? A. When I first treated Mr. Weston he was as any other man in his family relations. He was in all respects, as I saw him, quite a normal man; but there was a change in his general bearing which I noticed, of course, more particularly with reference to his family, as I was quite well acquainted and went to his house frequently. When I first knew Mr. Weston, his family, during his sickness when he was laid up at home, waited upon him as a man's family would wait upon him. Later, there was less of this attention; they were less about him when he was sick.

"Q. Describe the nature of that ulcer? A. It was

a tissue degeneration. When a man has chronic ulcers on his legs it means that the circulation is bad; that there is a depleted condition of his system, and there is that tendency to decline which means the advance of old age and dissolution.

"Q. Did you ever observe anything affecting him in any other way? A. I must ask you to let me be clear when you ask me that question. Do you mean to ask me whether there was any other effect from those ulcers, or the condition that produced the ulcers?

"Q. I mean the general condition he was in. A. There must have been; there was a general atheromatous condition.

"Q. What do you mean by that? A. It means a degeneration of the vessels that shows itself in the vessels, and is attended with a tendency to degeneration and impairment of the functions of all the organs of the body, more marked in some than others.

"Q. Does that apply to the brain as well as other organs. A. Yes.

"Q. Now, restrict yourself as to his sanity up to that time, or shortly afterwards, to show the condition of his mind on June 12, 1899. A. It must have been in the winter, I should say then, of 1898 and 1899, when I met Mr. Weston on a car. I asked him how he was getting along. He seemed to be in an abstracted mental condition and didn't talk as freely as he used to, and I dropped the subject. He then went back to it and said, 'You asked me how I was a while ago'—

"Q. Did this conversation throw any light on your mind in forming your opinion as an expert of his mental condition? A. I am not an expert on mental conditions.

"Q. Did it throw any light on your mind as to his mental condition at that time as to his sanity or insanity? A. It caused me to raise a question at that time."

The witness referred to a remark which Mr. Wes-

ton made at the time which shocked him, and being permitted to explain what it was, he said: "I asked Mr. Weston how his wife was, and he turned on me—I had asked him how his health was, and he said he had the same old leg that bothered him off and on, and his kidneys had given him trouble, and I asked him how Mrs. Weston was, and he turned on me and said, 'The she devil;' he said, 'The she devil never gets sick enough,' or words to that effect. Of course I was very much shocked."

"Q. State what his mental condition was as compared with what it was when you first knew him? A. Well, Mr. Weston was a very agreeable man personally. He seemed to be a pleasant man in his home, and he was fond of a jest and liked to tell a story and he loved to hear them told; he was a man of a good deal of speech.

"Q. That was along in 1888 when you first knew him? A. Yes, sir.

"Q. What was his condition from that time on as you observed it, up to and including 1899? A. Well, I think there was a difference.

"Q. What difference did you notice? A. I thought Mr. Weston was not so fond of a story; he didn't enter into jests. He seemed rather morose, and I thought at times somewhat of a hypochondriac.

"Q. Explain what a hypochondriac is to the jury? A. A hypochondriac is a person who is morose and takes rather a gloomy view of things and does not enter into ordinary things that generally interest people, but is disposed to take a dark view of things."

Another witness, V. I. Banta, who was alderman of the city of Westport, testified that Weston was appointed inspector of the waterworks plant which the city was constructing in 1895 or 1896; that at times Weston "did not seem to act right," and he thought,

from his actions, that "he was either drinking or crazy."

The will in question reads as follows:

"I, Thomas Weston, of Kansas City, in the county of Jackson, State of Missouri, do hereby make and publish this my last will and testament, revoking and setting aside all wills heretofore made by me.

"1. I desire that my body may be buried plainly but decently, and that on the headstone at my grave there be shown my name, date and place of birth, and the date and place of my death.

"2. I desire that all my just debts be paid as speedily as is required by the laws of Missouri.

"3. I am at this time unmarried, my former wife, Mary Weston, having been divorced from me at the June term of the circuit court of Jackson county, Missouri, 1899. I made with her a fair division of the property that I was then worth, and she is suitably provided for.

"4. I have but five children living, to-wit: my sons George Weston and Edgar William Weston, both of whom live in Kansas City, Missouri, and my daughter, Clara Minnie Storr, formerly Weston, wife of Renner Storr of Rosedale, Kansas, Mary Jane Weston, of Kansas City, Missouri, and Alice Theuringe, wife of Leonard Theuringe, who lives in Tennessee. To each and every one of my said children I give, devise and bequeath the sum of one dollar and no more. One or more of my children died in infancy, but none left heirs at law.

"5. I give, devise and bequeath unto Mary Hanson, who now resides on Baltimore avenue (within the limits of the former city of Westport) of Kansas City, Missouri, all the rest, residue and remainder of my property, real, personal and mixed, wherever situate.

"I hereby appoint George W. Lee, of Kansas City, Missouri, the executor of this my last will and testament.

"Given under my hand this 12th day of June,
1899.

"THOMAS WESTON,

"Testator."

Milton Moore, the lawyer who drew the will, testi-
fied for the defendants as to how he came to do so.
He said that the testator came to his office and told him
that he wanted some property matters settled and de-
sired his advice in the matter. He went with the tes-
tator to the office of Hamner, Hardin & Hamner, where
he met Mr. Ben. T. Hardin and Mrs. Weston, and Mr.
Hardin showed him a deed written by him, dated June
9th, by which the testator conveyed certain lots of
land in Kansas City to Mrs. Weston. The testator told
him that his wife had sued him for a divorce and had
gotten it the day before. On the same day the testator
also told him that he wanted to make a will, and that he
would make it to Mary Hanson, and witness told him to
come to his office when he got ready, and he would
draw up the will for him. Up to this time he, wit-
ness, had never heard of Mary Hanson. Two days af-
terwards, on June 12th, the testator came to his office,
when the will was drawn up and executed. The testa-
tor gave the place of residence of George Weston as
Kansas City, Missouri, Edgar William Weston as Kan-
sas City, Missouri; Clara Minnie Storr, Rosedale, Kan-
sas; Mary Jane Weston, Kansas City, Missouri, and
Alice Theuringe, wife of Leonard Theuringe, residing
in Tennessee. These were all the testator's children.
The name of Mary Hanson and her place of residence
were also given by the testator, and he it was that sug-
gested the provision in the will "that on the head-stone
at my grave there be shown my name, date and place
of birth, and the date and place of my death." Mr.
Weston also suggested that George Lee be named as
executor. Witness further testified that Mr. Weston
at the time of making the will was unquestionably of

sound mind, and was a man of strong character and great physical strength. That the reason he gave for disinheriting his children was that "in the divorce proceedings they all turned against him."

G. L. Love, one of the witnesses to the will, testified that he signed it in the presence of Mr. Weston and the other witnesses; that he thought the testator at the time was of sound mind; that he had known him several years, that he was a stout, rugged man, of a good deal of force and determination.

The other witness to the will was George H. Kelly, a lawyer. He testified that he considered Mr. Weston of sound mind at the time he executed the will, and that he was a man of strong will power.

The first question presented for consideration upon this appeal is as to whether Thomas Weston, the testator, had sufficient capacity to make the will at the time he executed it. Had he sufficient intelligence to know what property he owned, what disposition he was making of it, all the persons who reasonably came within the range of his bounty, and to transact his ordinary business affairs? These are the tests of capacity to make a will. [Harvey v. Sullens, 56 Mo. 372; Benoist v. Murrin, 58 Mo. 307; Norton v. Paxton, 110 Mo. 456; Couch v. Gentry, 113 Mo. 248; Kischman v. Scott, 166 Mo. 214; Jackson v. Hardin, 83 Mo. 175; Riggin v. Westminster College, 160 Mo. 570; Martin v. Bowdern, 158 Mo. 379; Fulbright v. Perry County, 145 Mo. 432; Von De Veld v. Judy, 143 Mo. 348; Riley v. Sherwood, 144 Mo. 354.] Governed by these tests, this court will examine the record to see whether there was substantial evidence to take the case to the jury, and, if there was, convict the court who heard all the evidence of error in sustaining the demurrer interposed by defendants to the evidence and in refusing to submit the case to the jury. In doing this, however, we are not to lose sight of the fact that the testator's brutal treatment of his wife, as shown by the evidence in this case, is not one

of the tests of testamentary capacity, for a man may be unkind and brutal in his treatment of his wife and yet have capacity to make a will.

The witnesses to the will, of whom there were three, all testified that the testator was sane at the time of the execution of the will, and there was not a scintilla of evidence to the contrary. The will was prepared in exact compliance with his wishes as indicated at the time. He gave the lawyer who drew up the will the names and places of residence of each of his children and the devisee named in the will, the description of all his property and how he wanted to dispose of it, and directed that the will provide, as was done, that on the headstone at his grave there be shown his name, date and place of birth and the date and place of his death. Besides this, two or three days before the execution of the will the testator divided his property about equally with his wife, Mrs. Mary Weston, by deeding to her certain real estate and giving her seven hundred dollars in money, as consideration for her relinquishment of her dower in his remaining estate. She is, therefore, not a party to this suit, and her testimony respecting the testator's brutal treatment of her can only be considered with relation to and as throwing light upon the question of his capacity to make the will at the time of its execution.

Mrs. Weston testified as a witness for plaintiffs, and, upon cross-examination, was asked several times if she thought her husband was insane at the time he executed the deed to her, but as often evaded the question or declined to answer, but finally said she did not know. But with respect to the will itself, in view of the testimony of the attesting witnesses and especially of that of Mr. Moore, who wrote it at the direction of the testator and signed it as a witness, the testimony introduced by plaintiffs for the purpose of showing that the testator was incompetent to make the will was utterly weak and valueless. As was said in Wood v. Car-

penter, 166 Mo. l. c. 487, "No one who reads that will can believe for a moment that the one who dictated it was incapable of making a will."

In Fraser v. Jennison, 42 Mich. l. c. 229, Judge COOLEY, speaking for the court, said: "Nothing is more unquestionable than that, by the Statute of Wills, it was intended that every man should be at liberty to select the objects of his bounty among his relatives at his discretion, or even to pass them all by if so disposed." As was said by GANTT, J., speaking for the court, in Sayre v. Trustees of Princeton University, 192 Mo. l. c. 130: "It would indeed be strange that a man could do all that he did, that he could gather together a fortune, make loans, examine his titles, deal with people generally, and yet not possess the capacity to make a will. The fact is that he possessed this capacity, and his actions in business demonstrated beyond a doubt that he was perfectly sound of mind on August 7, 1899. To sanction the setting aside of the will of such a man under such circumstances would in effect be to repeal the Statute of Wills."

In Brinkman v. Rueggesick, 71 Mo. l. c. 556, Judge NAPTON, speaking for the court, said: "It is sufficient if the testator knew what he was doing and to whom he was giving his property. And it is conceded in most of the cases that a man may be capable of making a will, and yet incapable of making a contract, or managing his estate."

In Von De Veld v. Judy, supra, Judge SHERWOOD, speaking for the court, said: "Although when a charge of insanity or imbecility is made against a testator, evidence is competent to show the condition of his mind long prior to and closely approaching the time of the will's execution, as well as the condition of his mind shortly subsequent to such execution, yet the purpose of such prior and subsequent testimony is only to indicate the state of his mind at the very time the execution of the will took place. That is the true time to

try his mind. The fact of competency is to be decided by the state of the testator's mind at the time the will was made, and although evidence is always admissible of prior and subsequent occurrences as tending to shed light on the question of the state of his mental faculties and of his bodily health on the day of the will's execution, yet such evidence is only receivable for that purpose alone and is not otherwise to be regarded. . . . . The admission that Smith stood ready to establish did not go to the capacity of Judy to make a will, but to his competency to make a contract, and our decisions all show that a man may be entirely competent as to the former, while incompetent as to the latter.''

In Southworth v. Southworth, 173 Mo. l. c. 73, it is said: ''Mere opinions of witnesses, unaccompanied by any testimony showing any particular act or fact evidencing incompetency, do not make out a case of incompetency when the testimony shows that the testator 'knew what he was doing and to whom he was giving his property.' ''

There is nothing in the evidence disclosed by the record in this case which even remotely tends to show that the testator was not perfectly sane and in full possession of his mental faculties at the time of the execution of the will. That he was unjust to his children may be true, but we know of no law which prohibited him from disinheriting them if he was so inclined. If he was competent to make the will, of which we have no doubt, he had the right to dispose of his property as he thought proper.

It is true that Dr. Ayers, who became testator's physician in 1888, and so continued, off and on, to the time of his death, testified that the testator had chronic ulcers on his legs and that he had urinary calculus which caused him excruciating pain and very great illness at times, but neither these facts nor any others in evidence tended to show that the testator did not have

capacity to make the will, and really amounted to nothing. He was a man of more than ordinary intelligence, had occupied responsible positions, attended to his own business affairs, bought property and accumulated quite an estate, was perfectly sane at the time he made the will, and if a will executed under such circumstances will not withstand the assaults of persons disappointed by its provisions, the statute authorizing men over twenty-one years of age to dispose of their property by will is a dead letter and should be repealed. In reaching this conclusion, too, we assume that, owing to the unnatural disposition of his property by the testator, the burden was upon the defendant to establish the validity of the will.

It is next contended by plaintiffs that the will was obtained by the undue influence exercised over the testator by Mary Hanson, the devisee named therein, and that she acquired and exerted such influence over his mind at the time of the execution of the will that she was made practically sole beneficiary. This contention is based upon evidence which tended to show that the testator, for some time before, and up to and at the time of the execution of the will, sustained immoral relations with Mary Hanson.

In Lorts v. Wash, 175 Mo. 505, Judge Fox quotes with approval the following from Sehr v. Lindemann, 153 Mo. 276: "By undue influence is meant such influence as amounts to force, coercion or over-persuasion which destroys the free agency and will power of the testator. It is not merely the influence of affection or desire to gratify the wishes of one who is near and dear to the testator. And 'affirmative proof of such influence is required to be made, either by direct facts shown, or by facts and circumstances from which undue influence results as a reasonable and fair inference, and not a mere conjecture.'"

Plaintiffs, in support of their contention, cite a large number of authorities, but it will be necessary to

notice only such as bear directly upon the question of undue influence.

In Sunderland v. Hood, 13 Mo. App. 232, it was held that a will produced by influence arising from unlawful sexual intercourse between the testator and the legatee is not void, unless such influence was exerted in restraint of the will of the testator. The court said: "There is no direct evidence that the defendant exerted any influence over Sunderland at the time of making his will, unless we are to hold that, if a man knowingly and wrongfully lives in a state of concubinage or adultery, and the woman, by the influence of such cohabitation, procures a will from her paramour, cutting off his relatives, the will must be held void for illegal influences. But we do not think this is the law. If the will was the free choice and judgment of a person in possession of the necessary facts, not deceived or tricked in any way, and really free at the time he made the will, we do not think that the law will consider the morality of his motives. Every will is procured by some influence. It is enough, as to this, that free choice and judgment are not interfered with. The law does not prohibit a man from making a will in favor of a woman with whom he has maintained, and maintains at the time of making a will, an illicit intercourse."

That ruling was approved by this court in the same case (84 Mo. 293), wherein it is also ruled that the case of Dean v. Negley, 41 Pa. St. 312, does not give any support to the position that "the influence of an adulteress over her paramour will, in itself, avoid his will in her favor." While in the subsequent case of Rudy v. Ulrich, 69 Pa. St. 177, it was held that the ruling in Dean's case was correct under the circumstances, it is denied, as a universal proposition, that a meretricious relation between the testator and the legatee is of itself proof of undue influence. To the same effect is Wainwright's Appeal, 89 Pa. St. 220.

In Shipman v. Furniss, 69 Ala. 555, it was held that

where one, living in illicit relations with another, gives to such person property of considerable value, especially when the donor in making the gift excluded natural objects of his bounty, the transaction will be reviewed by a court of equity with such suspicions as to cast upon the donee the burden of proving that the donation was the result of free volition, and was not superinduced by fraud or undue influence. But in that case the legatee's own attorney drafted the instrument, and she accompanied the grantor to the city and also to the attorney's office, both when the instructions were given for its preparation and at the time it was signed. The evidence in the case failed to show that any compulsion was used tending to overcome the free agency of the grantor at the immediate time the deed was signed, but his habits of frequent and excessive intoxication and sexual indulgence seemed to have impaired both his mental and physical condition to such an extent as to render him easy of control and susceptible to wrongful influence, and he came under the absolute control and dominion of the legatee.

In Smith v. Henline, 174 Ill. 184, it is held that in determining the question of undue influence, the jury may consider the fact of the existence of an illicit relation between the testator and the beneficiary in the will where there is proof tending to show constraint and interference by her, and the testator's impaired mental capacity, loss of will power, sickness or disease, when making the will. But in that case the devisees were present at the time of the execution of the instrument, and it was through their machinations and fraud that its execution was procured; and the court clearly intimated that it was because there was evidence tending to show constraint and interference, impaired mental capacity, loss of will power, and sickness or disease, at the time of the making of the will, that the burden was upon the beneficiaries in the will to show that it was the free and voluntary act of the testator.

In McClure v. McClure, 86 Tenn. 173, it is held that suspicion usually attaches to a bequest to a mistress, especially if it be unnatural. But suspicion is not evidence of anything, and is entitled to no consideration in the trial of any cause.

These cases are all answered by the evidence in the case at bar, which does not show that the defendant was present at the time of the execution of the will. Nor does it show that she ever knew that it was about to be executed, or that she had any conversation with the testator in regard to it before its execution; but it does show that the testator was a man of intelligence, a shrewd business man who had occupied prominent positions, and that he was a man of fine physique and of strong will power; that he went alone to his attorney and employed him to prepare his will, gave him full and explicit directions as to how he wished to dispose of his property, also the names and places of residence of each of his children, and was at that time in possession of all his mental faculties; and it is only in the absence of some one or more of these conditions that the authorities which we have referred to, except Dean v. Negley, supra, and McClure v. McClure, supra, have held that a presumption of undue influence arises from meretricious relations existing between the donor and the donee. Dean's case has been overruled, or its holding modified, by subsequent cases in the same court, and this court and the St. Louis Court of Appeals declined to follow it. [Sunderland v. Hood, supra.] Besides, such an inference should not be drawn from the evidence relating to the relations which existed between the testator and the devisee in the case at bar, in the absence of proof that Mary Hanson "exerted her influence in the procuration of the will." [Arnault v. Arnault, 52 N. J. Eq. 801; Dickie v. Carter, 42 Ill. 376.]

The presumption is in favor of the theory that the

will expresses the purpose and intention of the testator. "Without proof that a mistress influenced a testator directly in procuring a will in her favor, it cannot be inferred from their relations that she secured an influence over him which she would naturally and improperly exert to advance her interest." [Middleton's Case, 68 N. J. Eq. 584; Monroe v. Barclay, 17 Ohio St. 317; Matter of Mondorf, 110 N. Y. 456.] The law as announced in Middleton's case, supra, is, as we understand it, the law of this State as declared in Sunderland v. Hood, 13 Mo. App. 232, and Sunderland v. Hood, 84 Mo. 293, and to which we adhere.

It is also claimed by plaintiffs that the court erred in excluding certain parts of the depositions of Allen Mills and John Mills, and in excluding other evidence which plaintiffs contend was competent, relevant and material. The record shows that the excluded testimony of Mr. and Mrs. Mills had reference to matters tending to show the existence of criminal relations between the testator and the defendant, and the other evidence excluded was to the effect that the testator acquired the property described in the will with the assistance of his wife and children. In the first place, it was immaterial how or in what way the testator acquired his property, and, in the next place, we have considered the appeal just as if immoral relations existed between the testator and the defendant at the time of the execution of the will and for an indefinite time prior thereto.

For these considerations our conclusion is that the demurrer to the evidence was properly sustained, and that the judgment should be affirmed. It is so ordered.

All concur.