[Civ. No. 754. First Appellate District.—April 27, 1910.]

In the Matter of the Estate of PATRICK RIORDAN, Deceased. DANIEL JAMES REARDON et al., Contestants of Will, Respondents, v. JAMES D. FITZGERALD, Proponent, Appellant.

WILL—CONTEST OF PROBATE—MENTAL UNSOUNDNESS OF TESTATOR—INSANE DELUSION AS TO FACTS RESPECTING CHILDREN.—If a testator, against all evidence and probability, believed supposed facts respecting his children, which had no existence except in his perverted imagination, and conducted himself, however logically, upon the assumption of their existence, he is, so far as such facts are concerned, under an insane delusion; and if he was the victim of such a delusion when he executed his will cutting off his children with one dollar each, and if the provisions of the will were caused by such delusion, the instrument is not his will, and its probate may be contested by such children for the mental unsoundness of the testator.

ID.—INSANE DELUSION NOT PROVED—VERDICT OF UNSOUND MIND AGAINST EVIDENCE.—Where no witnesses other than the interested children assailed the testamentary capacity of their father, and twenty disinterested witnesses intimately acquainted with him testified to his mental soundness, and the evidence of the children was mainly addressed to his harsh and cruel treatment of them

and of their mother prior to her divorce from him twenty-two years before his death, wherein he settled upon her the greater portion of his property, and the children sided with their mother, and for many years prior to their father's death had no relations with him and avoided and refused to speak to him, and there is no evidence tending to show an insane delusion respecting them, and it was proved that his will was his voluntary and intelligent act, a verdict that he was of unsound mind when it was executed is against the evidence.

Id.—Bad Temper No Proof of Insane Delusion.—A person may have a bad temper, and under its influence may say and do wrong and unnatural things, and still not be laboring under an insane delusion as to the objects of his hostility.

Id.—Prejudices, Antipathies and Dislikes not Destroying Testamentary Power.—Prejudices, antipathies, and dislikes, however ill-founded or however strongly entertained, cannot be classed as an insane delusion. People may hate their relations for bad reasons, and yet not be deprived of testamentary power.

Id.—Belief Against Children not Without Reason.—Whatever belief or opinion the testator entertained toward his children when the will was made, the record does not show there was no reason therefor, or that he adhered to it against all evidence and argument. If the deceased had, after the divorce was granted to the wife, who obtained the largest part of the property, made a will disinheriting the children who sided with their mother, as to the residue of his property, it could not be said to be without reason, and in view of their subsequent course of conduct, his last will, so far from being the result of insanity, was a very natural thing to do.

Id.—Belief not Unchangeable for Proper Reason.—It does not appear that he could not have been reasoned out of his belief, upon a changed course of conduct of his children. Where the testator's belief is not so fixed that he could be reasoned out of it, it will not be held to be a delusion.

Id.—Residence with Nephew—Absence of Undue Influence.— Where, for many years, the testator had resided with a nephew, and had, without suggestion, showed a strong disposition to leave the bulk of his estate to his nephew and his son, and his last will was made six years before his death, and when he was in robust health, and was made without suggestion from anyone, as his voluntary act, free from any suspicious circumstances, and the persons named were the natural objects of his bounty, a verdict that the will was procured by the undue influence of the nephew is against the evidence.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco, denying probate of the

will of a deceased person, and from an order denying a new trial.  J. V. Coffey, Judge.

The facts are stated in the opinion of the court.

Frank J. Hennessy, Stafford & Stafford, and W. P. Caubu, for Appellant.

Wm. M. Cannon, for Respondents.

KERRIGAN, J.—This is an appeal from a judgment denying probate to the will of deceased, and from an order denying appellant's motion for a new trial.

Patrick Riordan was born in Ireland, and came to California in 1849.  He married in San Jose, and there settled on a ranch.  His first child was born in 1862, and during the succeeding sixteen years he became the father of twelve children, nine of whom are still living.  Upon an original investment of $8,000 he had in the year 1885 accumulated property of the value of $45,000.  In that year his wife secured a divorce from him on the ground of his extreme cruelty, and at the same time they agreed upon a division of the community property.  Of the ranch, consisting of two hundred and thirty-one acres, she received one hundred and fifty-one acres, and he eighty acres, and the cattle thereon were divided equally between them.  Thereafter Patrick Riordan moved a barn or granary from another part of the ranch to within about two hundred yards of the Riordan family home, and resided in it for more than two years, thereafter making his home in San Jose and San Francisco until the time of his death.

He executed his last will on July 6, 1901, and he died in San Francisco on July 6, 1907.  By his will he gave to each of his nine children the nominal sum of one dollar, and in explanation thereof he stated, "I give my children no more because they have lived apart from me and for other sufficient reasons not here given."  To each of two nieces residing in Ireland he bequeathed $2,000.  He gave to his nephew James D. Fitzgerald, in trust for the latter's minor son, James R. Fitzgerald, a certain piece of improved real property situated in San Francisco.  He nominated James D.

Fitzgerald executor of his will, and bequeathed to him the residue of his estate.

When this will was offered for probate it was contested by the children of the decedent, who alleged that their father was of unsound mind and under the undue influence of James D. Fitzgerald when he made the same. The jury found on both of these issues in favor of the contestants. Upon the verdict judgment was entered denying probate to the will. A motion for a new trial was duly made, and denied.

The evidence shows that in 1887 decedent sold his share of the ranch and went to live in San Jose. In 1889 he visited Ireland, and some two years later made a second visit to that country. From the year 1887 until his death he engaged in no regular business, although he bought some real property and occasionally loaned money on security, attending personally to all his own affairs. He went when and where and with whom he pleased. He was a man of intelligence, but very set in his views. He always enjoyed good health until in July, 1907, when he was taken ill with pneumonia, and died after an illness of about six days, being at that time eighty-five years of age.

From 1887 until his death—a period of twenty years—he made his home with the family of Dr. James D. Fitzgerald, his nephew.

The proponent of the will called twenty-four witnesses, intimate acquaintances of the deceased, all of whom testified that he was of sound mind.

The contestants admitted that their father was a sober and industrious man; that he provided them with a good home up to the time of the separation from his wife, when they remained with her; that he sent them to school, visited them there, and attended church every Sunday with his family. They also testified that he was a successful and perfectly sane man in every regard, with the single exception that he entertained an insane delusion as to his children.

If a person, against all evidence and probability, persistently believes supposed facts which have no existence except in his perverted imagination, and conducts himself, however logically, upon the assumption of their existence, he is, so far as they are concerned, under an insane delusion. (*Estate of Scott,* 128 Cal. 62, [60 Pac. 527]; *Estate of Ken-*

*drick,* 130 Cal. 364, [62 Pac. 605] ; *Estate of Redfield,* 116 Cal. 652; [48 Pac. 794].) If the testator was the victim of a delusion, as thus defined, in respect to his children at the time he executed his will, and the provisions thereof were caused or affected by such delusion, the instrument is not his will.

Seven of the contestants testified at the trial that at the time of the separation of their father and mother in 1884, he was of unsound mind as to his children, basing their opinion upon his harsh and cruel treatment of them. He had an ungovernable temper, and would often become enraged at the children, at such times inflicting upon them, or attempting to do so, the harsh and cruel treatment complained of.

Their testimony is substantially as follows: Several times quarrels with one of the children would involve the whole family, and the mother with the children would run out of the house, and while they were outside the decedent would walk up and down the floor with a light in one hand and a club, or some similar instrument, in the other, muttering to himself. When he would retire for the night, at about 2 o'clock they would crawl through the window into one room, and there the boys would sleep on the floor and the mother and the girls on a bed. At times for some reason or other, and again without apparent reason, he would hit or attempt to hit one or other of his children, or he would swear at them, the term generally employed being "You damn scoundrel." On one occasion his son Thomas, who was helping his father catch some horses, permitted them to get away. This angered the decedent, and he called the boy a "damn scoundrel." Thomas ran away and his father pursued him into a bedroom where Mrs. Riordan was, and then addressing Mrs. Riordan he said, "You damn scoundrel, is that what you are doing?" and he attempted to hit her with a blacksnake, but missed her and cut the window curtain. Thereupon the "mother ran out, and all the folks ran into the yard." On another occasion, upon being informed that the children wanted some books, Riordan hit his eldest son over the back with a rope doubled, threw him against the wall, and said, "You damn scoundrel, it's books you want. I will give you books." He also seized a pitchfork and chased his son into the house. One day at the table his daughter Mary

asked for sugar, and he became angry, and when Mrs. Riordan tried to quiet him he struck her on the temple with a brass candlestick. On another occasion a daughter asked for butter, whereupon he grabbed a plate to throw at her, Mrs. Riordan interfered and he struck her on the nose.

It would be tedious to detail further the testimony. However, it is proper to state that there were a number of instances somewhat similar to those just detailed. The children also claimed that their father showed them no paternal affection, and that they were afraid of him. After 1884, and while the decedent was living in the barn, on several occasions he pointed his finger at the children and swore at them, and also on other occasions stated that the loss of his eye (which was removed in 1892) was caused by one of his sons.

For the purpose of showing that the condition of mind of the testator as disclosed by these incidents continued to exist down to the time the will was executed, seventeen years later, the contestants rely on some deeds, transfers of bank accounts and three wills, including the one in question, by which acts the decedent gave all or nearly all of his property to the Fitzgeralds, and thereby showed, as they claim, a persistent and fixed desire to prevent them from receiving any of his estate.

Not a witness other than the children testified that the decedent was without testamentary capacity; and ignoring the remoteness of this testimony, and assuming that the condition of mind of the decedent toward his children in 1885 was shown to exist in 1901 when the will was made, still we think the testimony only disclosed that the deceased was harsh and cruel and was afflicted with an ungovernable temper, and that it utterly fails to show that he was laboring under any insane delusion. A person may have a bad temper, and under its influence say and do wrong and unnatural things, and still not be laboring under an insane delusion as to the objects of his hostility.

In *Estate of Kendrick*, 130 Cal. 364, [62 Pac. 607], it is said: "Prejudice, dislikes and antipathies, however ill-founded, or however strongly entertained, cannot be classed as insane delusions, nor is every delusion an insane delusion."

In the case of *In re Spencer,* 96 Cal. 452, [31 Pac. 454], it was said: "The likes and dislikes of human beings—their confidences and mistrusts—are often capricious and arbitrary; but they are not evidence of insanity because they cannot be logically defended to the satisfaction of those who think them wrong. In the case at bar there is no warrant for the claim that the testatrix's dislike of her daughter in law and her family was an insane delusion; it was simply such a feeling, arising out of the recondite principles of attraction and repulsion, as is quite common among people of undoubted sanity."

In *Estate of Carpenter,* 94 Cal. 419, [29 Pac. 1105], Judge Temple observes: "People may hate their relations for bad reasons, and yet not be deprived of testamentary power."

In *Weston* v. *Hanson,* 212 Mo. 248, [111 S. W. 44], although it was claimed that the testator was of unsound mind, the will was upheld. The court in so holding said: "We are not to lose sight of the fact that the testator's brutal treatment of his wife, as shown by the evidence in this case, is not one of the tests of testamentary capacity, for a man may be unkind and brutal in his treatment of his wife, and yet have capacity to make a will."

In *Commer* v. *Skaggs,* 213 Mo. 334, [111 S. W. 1132], where the will was upheld, the testator disinherited his daughter because she married against his wishes. We quote from that case: "Many witnesses testified to Mr. Skaggs' exceeding and sore bitterness over this event, and for some time he did not speak of it without falling into a very ecstasy of rage, sometimes accompanied by such physical phenomena as 'foaming at the mouth,' 'pawing the grass,' and cursing and swearing. The record makes it clear that in the height of his bitterness he determined to disinherit his disobedient daughter. He told others he would do so. Accordingly, on the twenty-eighth day of February (the month of the marriage), the will in contest was executed, doing that very thing. . . . The resentment of the father was most human and natural though extravagantly exhibited. That he did not rise to the lofty and divine plane of complete forgiveness when time had healed his wounds is unfortunate, but is still natural and human—not insanity."

In *Schneider* v. *Manning*, 121 Ill. 381, [12 N. E. 269], the court says: "A man may become prejudiced against some of his children, and that too without proper foundation; and because he may make unjust remarks about them—remarks not warranted by the facts—it does not follow that he has insane delusions, or that he is devoid of testamentary capacity."

Whatever belief or opinion the testator may have entertained against the children when the will was executed, still the record fails to show that there was no reason for such belief or opinion, or that he adhered to it against all evidence and argument. In 1884 he and his wife were separated, and in 1885 they were divorced. The dates of the different acts of cruelty toward the children are not stated, but, basing their opinion upon these acts, those of the children who testified on the subject gave it as their opinion that the testator was of unsound mind in the years 1884 and 1885. Presumably the trouble between the testator and his wife had much to do with his exhibitions of temper. Riordan doubtless felt compelled to, and indeed did, make a generous division of his property with his wife. In this trouble the children sided with their mother, and if the decedent had made his will in 1885 disinheriting his children, it certainly could not be said that such act was without reason; much less could it be said of such a will made sixteen years later, the children in the meantime having reached adult age, and their path in life having made them and their father strangers. Indeed, conceding the right of testamentary disposition, it is difficult to understand how the children could have expected their father to make any testamentary disposition in their favor. After the year 1884 none of them ever called upon him or wrote to him; they ignored him then, and they continued to ignore him for twenty-two years and down to the time of his death. When any of them met him on the street they crossed to the other side or passed him by without speaking. Doubtless some of his children would have been unable to recognize him if brought face to face, or he to recognize some of them. They did not inform him of the death of their mother, which occurred in 1905. Their conduct showed clearly that they did not care for their father; and

while, in disinheriting them, he may not, as counsel says, have set an example of Christian charity, still so far from such course being the result of insanity it strikes us as a very natural thing to do. "Where it appears that testator's belief is not so fixed that he could be reasoned out of it, it will not be held to be a delusion." (*Skinner's Will,* 40 Or. 571, [62 Pac. 523, 67 Pac. 951].)

Little need be said on the question of undue influence. The decedent had shown for years a desire to leave the principal part of his estate to the Fitzgeralds. As before remarked, Riordan was a man of considerable intelligence with very fixed opinions, and no doubt it would have been difficult, if not impossible, to persuade him how to dispose of his property. He made three wills, and in each of them he practically disinherited his children. His last will was not a death-bed will made by a feeble old man, but it was made six years before his death and when he was in robust health. It was made without suggestion from anyone; in brief it was made free from any suspicious circumstances. Finally, we think nothing was more natural than that the decedent should have bequeathed his estate, as he did, to the Fitzgeralds with whom he had made his home for many years. They were the natural objects of his bounty.

For these reasons we think the verdict is not supported by the evidence. The judgment and order are reversed.

Cooper, P. J., and Hall, J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on May 25, 1910, and a petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on June 25, 1910.