Argued June 27, reversed July 10, 1917.

## COLEMAN *v.* COLEMAN.*

(166 Pac. 47.)

**Marriage—Annulment—Mental Incapacity.**

1. To warrant annulment of a marriage contract for mental incapacity as provided by Section 503, L. O. L., there must have been that mental incapacity insufficient to comprehend the nature of the business and to understand its quality and consequences, as required to avoid other contracts; marriage being recognized as a civil contract by Section 7016.

> [As to whether marriage to person of unsound mind is void or voidable, see note in Ann. Cas. 1912D, 1127. As to degree of mental incapacity sufficient to invalidate marriage, see note in Ann. Cas. 1913B, 1234.]

**Marriage—Annulment—Sufficiency of Evidence.**

2. Evidence *held* insufficient to establish mental incompetency and undue influence sufficient to avoid a marriage contract and conveyance of property incidental thereto, between inmates of a home for the aged, aged 79 and 73 years.

**Contracts—"Undue Influence"—"Due Influence."**

3. Solicitation, importunity, argument and persuasion are not "undue influence" sufficient to avoid a contract. Influence obtained by persuasion and argument, or by appeals to the affections is not prohibited and may be termed "due influence," and it is immaterial that the parties stand in confidential relations to each other. The line between "due" and "undue" influence when drawn must be with full recognition of the liberty due every true owner to obey the voice of justice, the dictates of friendship, of gratitude, and of benevolence, as well as the claims of kindred, when not hindered by personal incapacity or particular regulations, to dispose of his own property according to his own free choice. Influence obtained by flattery, importunity, superiority of will, mind or character which gives dominion over the will of another to such an extent as to destroy his agency, or constrain him to do against his will what he is unable to refuse, is "undue influence."

From Lane: GEORGE F. SKIPWORTH, Judge.

Suit by John B. Coleman against Helen A. Coleman to declare void a marriage contract and to secure the cancellation of an assignment of a contract for the

---

*On degree of mental capacity which will affect a marriage contract, see notes in 40 **L. R. A.** 737; 38 **L. R. A.** (N. S.) 818.

REPORTER.

sale and purchase of real property made with a third party. The lower court found in favor of plaintiff and defendant appealed. Reversed and suit dismissed.

Department 1.    Statement by MR. JUSTICE BURNETT.

This suit is not for the dissolution of a marriage contract, but for the purpose of having it declared void and incidentally to secure the cancellation of an assignment to the defendant of an agreement made by the plaintiff with a third person for the sale of real property upon which there was due about $1,000 of the purchase price.

The parties were married at San Diego, California, August 26, 1912. The plaintiff was then seventy-nine and the defendant seventy-three years of age. They were both inmates of the Fredericka Home for the Aged near that city. It is not a charitable institution, but those who seek admission must pay at least $500 entrance fee and a stipulated sum monthly for their keep. They were married after an acquaintance of about six months. The plaintiff was a man possessed of considerable property. He had an income varying from $600 to $900 a month derived from property which he had conveyed, charging it with certain stipulated installments to be paid to him during his life. Besides this he had holdings of real property and contracts for the sale of realty from which he derived regular payments. Some of his estate was situated in Eugene, Oregon, and other parts of it in San Diego, California. The complaint thus describes the plaintiff's capacity to make a contract:

"The plaintiff further alleges that by reason of the advanced years and physical infirmities of this plaintiff his mental faculties had become weakened and impaired to such an extent that during said time he was

an inmate at said Home of the Fredericka Home for the Aged, and at the time of the contracting of the marriage hereinafter set out he was incapable of understanding and incapable of grasping the full meaning and comprehending and realizing the result or consequence of contracting a marriage and that by reason of his advanced years and impaired mental faculties, his capacity to resist influence and importunities by persons who had acquired his confidence especially, had become weakened and impaired to such an extent that he could be easily influenced and readily imposed upon and his property taken from him without consideration by persons who might pretend to be his friends or in whom he had confidence.''

In this language the plaintiff narrates the conduct of the defendant in procuring the marriage:

"That shortly after he entered the home of the Fredericka Home for the Aged in February, 1912, the defendant, who was then Helen A. Orthwaite, also was a member of said Fredericka Home for the Aged as aforesaid and fully understanding and knowing the weakened and impaired mental condition of this plaintiff and by reason thereof his incapacity to transact business and enter into any contract, for the purpose and with the intention of procuring money and property from this plaintiff by devices, schemes and pretensions of friendship and attention to the welfare of the plaintiff, wormed herself into his confidence and acquired great and overpowering influence over him so that this plaintiff became completely under her control and dominion.

"The plaintiff further alleges that while both he and the defendant were so members of the said Fredericka Home for the Aged, the defendant who is a strong-minded person having acquired such influence over this plaintiff, persuaded and induced him to enter into the marriage relation with her and that he and the defendant were on August 26, 1912, married at San Diego, in the State of California. That said marriage was induced by the defendant's promises of care, atten-

tion and kindness towards the plaintiff and of her great interest in the said plaintiff and his welfare, and by her schemes, influence, persuasion and promises, fully knowing the weakened mental condition of the plaintiff induced him to enter into said marriage contract. * *

"The plaintiff further alleges that at the time of the said marriage and of the assignment of the said land sale contract hereinbefore set forth he did not grasp the situation of the same. That they were procured by said undue and overpowering influence, by false promises and in the execution of the schemes of the defendant to become possessed of all of the property of the plaintiff."

His initiatory pleading contains averments about the transfer of certain pieces of property the recovery of which is not sought in this proceeding and alleges in addition thereto the assignment by him to the defendant of a contract made by him with one Melvin Hansen whereby the latter agreed to pay the former $3,500 in installments as the purchase price of city property in Eugene. The cancellation of this assignment is the only property relief sought in this suit.

Aside from admitting the age of the plaintiff and his being an inmate of the Fredericka Home at the same time the defendant was there, the answer denies the whole complaint except as otherwise alleged. The defendant avers that all the transfers of property to her were made after the marriage voluntarily, freely, and understandingly on the part of the plaintiff. She states in respect to the marriage that it was consummated only at the earnest solicitation of the plaintiff himself and that he fully comprehended the nature, effect, and consequences of the relation thus assumed. Her prayer is merely for the dismissal of the suit.

The reply traverses the answer except as stated in the complaint. The Circuit Court rendered a decree

according to the prayer of the plaintiff and the defendant appeals. Pending the appeal the plaintiff died and at the hearing it was stipulated in open court that his personal representatives should be substituted in his stead.                REVERSED.    SUIT DISMISSED.

For appellant there was a brief over the names of *Messrs. Thompson & Hardy* and *Mr. Lark Bilyeu,* with oral arguments by *Mr. Bilyeu* and *Mr. Charles A. Hardy.*

For respondent there was a brief over the names of *Messrs. Foster & Hamilton* and *Mr. W. G. Martin,* with oral arguments by *Mr. Martin* and *Mr. O. H. Foster.*

MR. JUSTICE BURNETT delivered the opinion of the court.

1. We find in Section 503, L. O. L., that:

"When either of the parties to a marriage shall be incapable of making such contract or assenting thereto, for want of legal age or sufficient understanding, or when the consent of either party shall be obtained by force or fraud, such marriage shall be void from the time it is so declared by the decrée of a court having jurisdiction thereof."

In this state marriage is recognized as a civil contract: Section 7016, L. O. L. Like any other compact a marriage is valid as against him if at the time of its solemnization the party afterwards seeking to have it declared void had mental capacity sufficient to comprehend the nature of the business in which he was engaged and to understand its quality and consequences: *Carnagie* v. *Diven,* 31 Or. 366 (49 Pac. 891); *Swank* v. *Swank,* 37 Or. 439 (61 Pac. 846); *Dean* v. *Dean,* 42 Or. 290 (70 Pac. 1039); *Hamilton* v. *Holmes,*

48 Or. 453 (87 Pac. 154); *Pickett's Will,* 49 Or. 127
(89 Pac. 377); *Reeder* v. *Reeder,* 50 Or. 204 (91 Pac.
1075); *Ames* v. *Moore,* 54 Or. 274 (101 Pac. 769);
*Mansfield* v. *Hill,* 56 Or. 400 (107 Pac. 471, 108 Pac.
1007); *Stevens* v. *Myers,* 62 Or. 372, 382 (121 Pac. 434,
126 Pac. 29); *Bohler* v. *Hicks,* 120 Ga. 800 (48 S. E.
306); *Schmidt* v. *Schmidt,* 201 Ill. 191 (66 N. E. 371);
*Bauchens* v. *Davis,* 229 Ill. 557 (82 N. E. 365); *Drumm*
v. *Capps,* 240 Ill. 524 (88 N. E. 1020); *Conner* v.
*Skaggs,* 213 Mo. 334 (111 S. W. 1132); *In re Will of
James D. White,* 121 N. Y. 406 (24 N. E. 935); *In re
Brush's Will,* 35 Misc. Rep. 689 (72 N. Y. Supp. 421);
*Buchanan* v. *Belsey,* 65 App. Div. 58 (72 N. Y. Supp.
601); *McGovran's Estate,* 185 Pa. 203 (39 Atl. 816);
*Hemingway's Estate,* 195 Pa. 291 (45 Atl. 726, 78 Am.
St. Rep. 815); *Kendrick's Estate,* 130 Cal. 360 (62 Pac.
605); *In re Riordan's Estate,* 13 Cal. App. 313 (109
Pac. 629); *Hartung* v. *Holmes,* 159 Cal. 161 (113 Pac.
130); *Stull* v. *Stull,* 1 Neb. Unof. 389 (96 N. W. 196);
*Taylor* v. *McClintock,* 87 Ark. 243 (112 S. W. 405);
*Deckenbach* v. *Deckenbach,* 65 Or. 160 (130 Pac. 729);
*Wade* v. *Northup,* 70 Or. 569 (140 Pac. 451); *Magness*
v. *Ditmars,* 81 Or. 598 (160 Pac. 527); *Sims* v. *Sims,*
121 N. C. 297 (28 S. E. 407, 61 Am. St. Rep. 665, 40
L. R. A. 737); *Dunphy* v. *Dunphy,* 161 Cal. 380 (119
Pac. 512, Ann. Cas. 1913B, 1230, 38 L. R. A. (N. S.)
818).

2. It appears from the testimony that the plaintiff
had become involved in meretricious relations with a
woman in San Diego named Kate E. Bacon, who had
obtained from him a considerable amount of property.
He had brought suit in the California courts to recover
what she had obtained from him and had gone to be-
come an inmate of the Fredericka Home. The suit
with Mrs. Bacon was finally compromised by her re-

turning to him most, if not all, the property. He became acquainted with the present defendant by reason of being thrown in her company at the table at the Home and because she made a practice of reading to the inmates of the institution, himself included, and conducted religious services there. He told her about his troubles with the Bacon woman and she aided him in looking up testimony and preparing for trial. He states that it was she who proposed the marriage and thus relates it:

"We had been acquainted quite a little bit. One day I was passing around as usual, and we were talking and she says, 'Now, Mr. Coleman, you recollect the first time you promised to marry me.' Well, I didn't have sense enough and stamina enough to tell her, 'Now, you sneak off. I never told you I would marry you in my life.' I think that's what took place. That is about the first of it."

He goes on to testify that it was some months afterwards when they were married; that her reading, praying, and talking to him, and paying attention to him had a good effect upon him and that it was not long before she had his confidence and "I couldn't hardly resent anything that she asked for or talked about."

He also declared under oath as follows:

"Q. Did you want to get married?

"A. I reckon I did at the time or I wouldn't have married her.

"Q. You married her because you enjoyed her companionship?

"A. Yes sir.

"Q. And liked to have her read to you?

"A. Yes sir.

"Q. After you were married, you built two rooms for yourself and your wife?

"A. I built the rooms before we were married, quite a while. * *

"Q. You knew you were married, didn't you?

"A. Yes sir. * *

"Q. Didn't get interested in anybody else?

"A. No sir.

"Q. You wanted to provide for your wife, didn't you?

"A. Well, I did, to a certain extent.

"Q. You did that of your own free will?

"A. Yes, nobody hired me to. * *

"Q. What are you bringing this lawsuit for? What is your idea?

"A. To get a divorce.

"Q. Why do you want a divorce?

"A. I don't want to be husband to a wife, that we don't live together. I guess I might say I don't like her and she don't like me.

"Q. It was suggested that you give all your property to your wife; you have an income now?

"A. Yes, I have an income.

"Q. How much is your income?

"A. Why, I don't just exactly remember how many dollars a month, it is.

"Q. Well, about how much?

"A. Well, about in the neighborhood of six hundred dollars a month.

"Q. You have had six hundred dollars a month all the time, haven't you?

"A. Yes, sir.

"Q. So you didn't give her everything?

"A. No sir, I did not give her my income.

"Q. And that six hundred dollars a month is an income to come to you as long as you live?

"A. Yes sir. * *

"Q. You have no close relations?

"A. Why, yes. * *

"Q. You have no children?

"A. No sir.

"Q. No brothers?

"A. No sir.

"Q. No sisters?

"A. No sir.

"Q. Your nearest relation is a nephew?

"A. Yes sir.

"Q. You have given him some property that he is to get after your death?

"A. Yes sir.

"Q. You know all about that?

"A. Yes sir.

"Q. There is nobody as near you as your wife?

"A. My nephew.

"Q. You wouldn't call your nephew as close to you as your wife, would you? You feel a man ought to provide for his wife?

"A. Yes sir.

"Q. And that is what you were doing?

"A. Yes sir.

"Q. You felt that you were doing the right thing in providing for your wife?

"A. Yes sir.

"Q. You were satisfied with that transaction until you decided to leave her. Isn't that a fact?

"A. Yes sir. I decided to sue her for a divorce and I employed Foster, and it has been on hands twelve months, and I aint got no divorce yet.

"Q. You have got tired of waiting and dissatisfied with the length of time?

"A. It seems that I ought to have it in less than twelve months.

"Q. Did you explain to Senator Wright what you wanted to do when you made the papers out?

"A. I guess I told him enough so that he did it.

"Q. You dictated it to him?

"A. I told him what I wanted him to do.

"Q. It was not until after you decided that you wanted a divorce that you wanted the property back, was it?

"A. Yes, I wanted the property back. * *

"Q. You would be satisfied to provide for your wife?

"A. Yes, I had done that before I decided to leave.

"Q. The reason you wanted your property back was because you decided to leave?

"A. No sir, I didn't want her to have my property unless she was my wife."

His physician who had known him for thirty years was asked this question: "He is up to the average for his age in mental ability taking into consideration his intellectual attainments?" to which he replied, "He is fairly average. So far as that is concerned a man of his age always declines mentally." Other witnesses for the plaintiff were business men who claim that he was not so bright as formerly but still they transacted business with him regularly even up to the time of the hearing.

The defendant stoutly denies having proposed marriage to the plaintiff but contends earnestly that he was persistent in his attentions to her which finally resulted in her consent to become his wife. In this she is corroborated by others residing at the institution. They lived together as man and wife for more than one year. The unchallenged testimony of those who testified for the defendant is to the effect that she was very tender and dutiful to him as a wife. On the other hand he was irascible, irritable, and quarrelsome with other inmates of the Home. The superintendent of the institution, a Mrs. Saylor, testified that she caught him in the act of striking the defendant with his cane and shamed him into an apology for that. After his frequent outbursts of anger he would be very agreeable until the next time he lost his temper, and it was during these benignant moods that he would make his gifts to the defendant.

About the transaction involving the latest disposition of his property, the testimony is to the effect that he had a spell of acute indigestion from over-eating which affected his heart functionally in consequence of which his wife told him that if he had another such

an attack he might die and that if he had any business
to arrange he had better attend to it.   She says he
then told her to come with him and they went to San
Diego where they consulted his physician who said
there was no organic trouble with his heart.   He im-
mediately took her to the law office of Senator Wright
and there dictated to him the transfer of the property
mentioned, including the contract now in dispute.
She says it was wholly without solicitation on her
part, was his own voluntary doing, and that she had
no intimation of his purpose until he stated it to the
attorney.   On another occasion he called two old
ladies, inmates of the Home, to witness a document
which he executed making provision for his wife.   He
gives as a reason for leaving the Home and returning
to Eugene where he had formerly lived, the fact that
he had had difficulties with other old men there and
that one of them had turned the hose on him.   This
altercation is described by other witnesses who say
that the plaintiff was wholly at fault in that matter.

When asked what kind of persuasion the defendant
used to get him to marry her, the plaintiff answered:

"She was kind and good to me, you might say.

"Q. Anything else?

"A. Why, no.

"Q. You married her because you thought she was
kind and good?

"A. Yes sir.

"Q. And that is the only persuasion that she used?

"A. She talked kind to me and respectful until—

"Q. What persuasion did she use to get you to as-
sign to her the Shelton mortgage?

"A. I don't recollect.

"Q. Did she use any persuasion to get you to turn
over property?

"A. I don't recollect.

"Q. Did she use any persuasion when you were in Senator Wright's office to get you to turn over the Biddle property?

"A. No. She talked to me about turning the property over before we started up to Wright's office.

"Q. What persuasion did she use to get you to do that?

"A. I don't know as you would call it persuasion. She said if I had another heart trouble, that I would die. That I better turn over the property to her, and I did so.

"Q. You were satisfied with this transaction until you decided to leave her?

"A. Well, I did it.

"Q. You were satisfied with it until you decided to leave her, weren't you? If you had stayed with her, you wouldn't care about that?

"A. I decided that I didn't want to give her a piece of property, in one piece twelve thousand dollars, and in another piece in the neighborhood of a thousand or over.

"Q. You changed your mind about it?

"A. I changed by mind that I didn't want to do that."

These excerpts from the plaintiff's own statements as a witness show that he well understood what he was about in all the transactions involved and that the defendant did not in any manner coerce or deceive him.

A careful reading of the whole record of the evidence reveals a clear preponderance showing that the marriage was sought by the plaintiff knowingly and understandingly. He was fully aware of the agreement into which he entered and the nature of it. He ratified it by more than a year's cohabitation with the defendant. He was the dominating character in the matrimonial venture. His business transactions during the time he lived in California show that he was

a man apparently able to take care of himself. It is true that in his liaison with the Bacon woman she had obtained an advantage over him from which he recovered as a result of his litigation against her. Even if we should consider the very vague and general averments of the complaint as sufficient to charge fraud or undue influence, there is not a line of testimony showing that the defendant took any undue advantage of the plaintiff or was guilty of any stratagem or fraud which would justify the annulment of the marriage or of the return of the land contract now in dispute. The sum and substance of the situation is that his reviving cupidity overcame his waning concupiscence. So it repented him somewhat that he had married the defendant, but more that he had been generous with her and he longed for the return of his hoard. It is abundantly proved that she was a dutiful wife. Indeed, he does not attack her on the ground that she was guilty of anything which would lead to a dissolution of a valid marriage but would overturn it on the ground that he was incapable of understanding the matrimonial contract into which he entered. The record discloses no situation of the kind. So far as the property was concerned it was his own. He had no relative nearer than the nephew for whom he had abundantly provided and nothing is more natural than that he should provide for his wife. If he chose to sow his wild oats in the December of his life he had no one to blame for it but himself.

3. On the matter of undue influence a text-writer lays down the rule thus:

"Solicitation, importunity, argument, and persuasion are not undue influence, and a contract is not to be set aside merely because the one party has used these means to obtain the consent of the other. Influence

obtained by persuasion and argument or by appeals to the affections is not prohibited either in law or morals and is not obnoxious even in courts of equity, and may be termed 'due influence.' Nor is the case changed because the parties stand in confidential relations to each other. The line between due and undue influence, when drawn, must be with full recognition of the liberty due every true owner to obey the voice of justice, the dictates of friendship, of gratitude, and of benevolence, as well as the claims of kindred, and, when not hindered by personal incapacity or particular regulations, to dispose of his own property according to his own free choice. But on the other hand influence attained by flattery, importunity, superiority of will, mind, or character, which gives dominion over the will of another to such an extent as to destroy free agency or to constrain him to do against his will what he is unable to refuse, is such influence as equity condemns as undue'': 9 Cyc. 455.

The death of the plaintiff has ended the marriage relation and there is nothing in the record justifying the court in canceling the assignment of the contract mentioned. The decree of the Circuit Court is reversed and one here entered dismissing the suit.

REVERSED.    SUIT DISMISSED.

MR. CHIEF JUSTICE MCBRIDE, MR. JUSTICE BEAN and MR. JUSTICE BENSON concur.