Argued June 5, affirmed November 8, petition for rehearing
denied November 28, 1967

KRUSE, *Appellant, v.* COOS HEAD TIMBER
COMPANY, *Respondent.*

432 P. 2d 1009

*Phillip A. Levin,* Portland, argued the cause for appellant. With him on the briefs were Pozzi, Levin & Wilson, Portland.

*John Foss,* Coos Bay, argued the cause for respondent. With him on the brief were McKeown, Newhouse & Johansen.

Before PERRY, Chief Justice, and McALLISTER, SLOAN, O'CONNELL, DENECKE, HOLMAN and LUSK, Justices.

HOLMAN, J.

This is an action by an employe to recover damages from his employer for personal injuries suffered in the course of employment. Defendant had elected non-compliance with the provisions of the Workmen's Compensation Law. Plaintiff contended defendant was guilty of common law negligence as well as violation of the Employer's Liability Act. The jury returned a verdict for defendant and plaintiff appealed.

Plaintiff was removing limerock from the interior of the base of an enclosed tower topped by a structure housing an elevator mechanism. As rock was removed with a rake, other rocks higher in the tower would sometimes shift, causing the tower to vibrate. Plaintiff was leaning over looking into an opening at the base of the tower when he was hit on the back by a piece of timber which fell from the tower. When asked if the tower was vibrating at the time of the accident, plaintiff testified: "It might have moved a little bit but not much." The timber fell from a place on the tower about where the tower met the structure which topped it. It was a 6″ x 8″ about 36 inches long and cut to fit the roundness of the tower. It had two rusty bolts at one end and weighed 40 to 50 pounds.

Subsequent to the injury the plaintiff signed an agreement to accept compensation in lieu of any claim for damages against defendant. Plaintiff claimed this agreement was obtained by fraud and misrepresentation. He also claimed lack of sufficient mental capacity

to contract by reason of mental retardation and post-traumatic psychoneurosis.

Plaintiff's first assignment of error is as follows:

"The court erred in connection with the cross-examination of witness Elsie Marks, in excluding plaintiff's Exhibits 24 and 25 for identification, and in refusing to permit plaintiff to use the exhibits in connection with the examination of the witness, or to cross-examine the witness with reference to the exhibits."

Elsie Marks was the defendant's office manager. She testified upon behalf of defendant to the circumstances under which the plaintiff signed the compensation agreement. Exhibit 25 was a purported electronic dictaphone recording of a telephone conversation between Mrs. Marks and an investigator for plaintiff's attorneys. Exhibit 24 was a typewritten transcription of the recording. The matter was presented to the court in the following manner. Mrs. Marks, on cross-examination, admitted she had a telephone conversation with a man who represented himself to be an investigator for plaintiff's attorneys relating to the circumstances under which plaintiff had signed the agreement. She was then handed Exhibit 24 and asked if it correctly portrayed the conversation. She replied that she did not remember a good portion of what appeared therein. Without attempting to question the witness concerning any particular portion, plaintiff then requested permission to play the recording, which request was refused, and neither exhibit was received in evidence. Plaintiff made no statement concerning his reasons for wishing to so play the recording but, when his request was refused, he asked that he be allowed to be heard out of the presence of the jury.

Thereafter, the following proceedings and offer of proof were had out of the presence of the jury:

\* \* \* \* \*

"THE COURT: The witness couldn't remember that being her conversation whereupon you produced an electronic recording of a type generally used on dictating equipment, correct?

"MR. KAHN: Yes, Your Honor, used on a Dictaphone.

"THE COURT: And offered to play that before the jury.

"MR. KAHN: Yes, Your Honor.

"THE COURT: Do you have something to play it on?

"MR. KAHN: I have a machine, Your Honor.

"THE COURT: This is the type of equipment which is readily alterable, I assume, like most dictating equipment?

"MR. KAHN: I am sorry —

"THE COURT: Erasable like most electronic equipment?

"MR. KAHN: No, Your Honor.

"THE COURT: You have someone here to authenticate that this took place—I think you pointed out that you didn't?

"MR. KAHN: I don't have Mr. Goodman here, however, I believe that Mrs. Marks will be able to identify her own voice and in the event she is not able to identify it, that the jury could identify her voice from having heard her on the witness stand.

"THE COURT: All right, say anything else you want to, this is for the record because I have already denied your permission to have it played to the jury.

"So for the record say anything else you want to about it.

"MR. KAHN: Your Honor, I would like to play it as an offer of proof.

"THE COURT: You mean out of the presence of the jury?

"MR. KAHN: Yes, Your Honor.

"THE COURT: What would that do?

"MR. KAHN: Well, Your Honor, in the alternative so long as I can stipulate with counsel that the girl accurately transcribed it off the recording, I will offer Plaintiff's Exhibit 24 as being what would be heard on the recording.

"But otherwise, I would like to play the recording, itself.

"MR. NEWHOUSE: Your Honor, we are not willing to enter into such a stipulation."

\* \* \* \* \*

■ On the basis of the present record neither exhibit was entitled to introduction in evidence. No proof was presented showing that the tape accurately recorded the conversation. Plaintiff's real contention is that by preventing him from playing the recording he was deprived of the opportunity to prove that the recording correctly portrayed the conversation the witness admitted having and, in any event, he was prevented from using it to cross-examine the witness.

■ Plaintiff first argues that playing the tape in the presence of the jury would have given the jury an opportunity to conclude that one of the voices in the recording was the voice of the witness to whom they had just listened and therefore the recording was authentic. However, Mrs. Marks' voice on the tape would not prove that the tape was an accurate recording of the particular conversation. No case has come to our

attention, nor have any been cited, which suggests that similarity of voice alone is sufficient authentication.⊙

Plaintiff also argues that if he had been permitted to play the recording to Mrs. Marks her memory might have been sufficiently refreshed by the sound of her voice to recall that the recording did correctly portray the conversation, thus authenticating it. In any event, plaintiff contends he should have been permitted to use it in cross-examining her.

■ Plaintiff first requested in open court that he be allowed to play the recording in the presence of the jury. At that time he did not state any reason for the request. Had his reasons been stated, the request would still have been properly denied because of the danger of prejudice to the defendant had the witness failed to verify the recording and denied making the statements. The preferable way is to initially allow the witness to listen to the recording on earphones or to play the recording to the witness out of the presence of the jury. *Slatinsky v. Bailey,* 330 F2d 136, 141 (8th Cir 1964) ; *United States v. McKeever,* 271 F2d 669, 675 (2nd Cir 1959) ; *Breeding v. Reed,* 253 Ia 129, 110 NW2d 552, 556 (1961).

■ The colloquy previously set forth took place out of the presence of the jury after plaintiff indicated a desire to be so heard. Then, for the first and only time, plaintiff stated that his purpose in playing the recording was to refresh the witness's memory by the sound of her voice. However, at this time plaintiff's attorney and the court were discussing plaintiff's previous request to play it in the presence of the jury and

---

⊙ See the fragmentary report in People v. Hornbeck, 277 App Div 1136, 101 NYS2d 182 (1950), which may be to the contrary. For a general discussion see 40 Virginia Law Rev, Magnetic Recordings in the Courts, 23 at 34-35, and 58 ALR2d 1024.

not his request to play it as part of plaintiff's offer of proof. This request had not yet been made. When plaintiff subsequently asked to play the recording as part of his offer of proof, the court asked his purpose in making such a request. Plaintiff's response was that, in the alternative, he would offer the typewritten transcript if counsel for defendant would stipulate it was correctly transcribed from the recording. This certainly would indicate to the court that plaintiff was not requesting that the recording be played as part of the offer of proof for the purpose of refreshing the witness's memory by the sound of her voice. At no time did plaintiff tell the court that he wanted the recording played out of the presence of the jury for the purpose of refreshing the witness's memory or for the purpose of cross-examining her concerning the statements made in it. His request was a proper one, if made for the purpose he now asserts. However, in the absence of telling the court his reasons for the request, we do not believe error was committed by the court's refusal to allow the recording to be played out of the presence of the jury.

It is difficult to frame a yardstick to apply in determining whether a party has been sufficiently specific in informing the court of the reasons for a request. The specificity required is determined by the reason for the rule that the court should be informed, i.e., to give the trial court an opportunity to rule intelligently. *Vancil v. Poulson,* 236 Or 314, 324, 388 P2d 444 (1964). The procedure that plaintiff now claims he was entitled to was unusual enough that plaintiff had a duty to make clear to the court the reasons for the request. We do not believe plaintiff did this.

Plaintiff's second assignment of error was the court's refusal to instruct the jury that defendant was

guilty of negligence causing the accident. Plaintiff first claims that the proof is uncontradicted that defendant failed to furnish plaintiff a safe place to work.

In *Shelton v. Paris,* 199 Or 365, 368, 261 P2d 856 (1953), this court held that ORS 654.010, which provides that an employer must furnish an employe a safe place to work, was declaratory of the common law. It also held that ORS 654.305, which was part of the Employer's Liability Act, enlarged the common law requirements by establishing a higher degree of care. Where the work involves risk or danger, the duty is imposed upon every employer within the Act to use every practicable precaution for the safety of his employes, regardless of cost and limited only by preservation of efficiency.

Whether the charge in plaintiff's complaint of failure to provide a safe place to work is considered an allegation of a breach of the common law duty or the enhanced standard under the Employer's Liability Act, there is a jury question whether the defendant was negligent in failing to comply with the standard of care imposed upon him if the evidence is such that reasonable minds can differ. The fact that an accident occurred does not make an employer negligent as a matter of law. The employer is not an insurer of the safety of his employes. *Shelton v. Paris,* supra, at 369. The question whether the defendant was negligent by failing to furnish plaintiff a safe place to work properly was presented to the jury. There was evidence which strongly inferred that the defendant was negligent in failing to adequately secure the timber. However, we cannot say that the fact the timber fell was conclusive of defendant's negligence and thus negligence as a matter of law. There was no absolutely certain evidence of the cause of its fall.

■ Even if the defendant was held.to have violated the high standard of care of the Employer's Liability Act, there still would remain the jury question whether the work was so inherently dangerous or presented dangers so uncommon that the employment would be classed as work involving "risk or danger" and thus come under the Act. *Richardson v. Harris,* 238 Or 474, 476-477, 395 P2d 435 (1964); *Skeeters v. Skeeters,* 237 Or 204, 216, 389 P2d 313, 391 P2d 386 (1964).

■ Plaintiff also claims that the uncontradicted evidence shows defendant violated the following portion of the Basic Safety Code:

"2.2 The structure and foundation and all parts thereof, of all buildings and appurtenances used for work shops, warehouses, factories or other places of employment shall be of such a construction as to enable them to be analyzed and designed by accepted rational methods in accordance with established principles of mechanics and sound engineering practice. They shall be of sufficient strength to support the estimated actual dead and live loads acting on them in addition to their own proper dead loads, without the resulting stress exceeding the allowable stress for the material being used. In addition to these loads, due and rational allowances shall be made for loads from wind, impact, erection, and any special loadings that may occur, and no combination of these loading shall cause a stress in any member that exceeds the allowable stress for the material of that member.

"2.5 The foundation and supports of structures shall be inspected regularly by a qualified person and all weakened structures repaired or replaced."

The quoted provisions of the Safety Code relate to the strength of materials which must withstand stress and to the prevention of stress upon materials in excess of that allowed. The evidence is devoid of any explana-

tion of the purpose which the timber performed. Nor is there any conclusive evidence of the cause of its fall. In the absence of conclusive evidence that its fall was related to a failure of the timber or any connected part of the structure to withstand the stress of its loadings, it would have been improper to tell the jury the Safety Code was violated.

Plaintiff's last assignment of error is his claim that the court improperly struck his second affirmative reply which pleaded that the compensation agreement was void because he did not have sufficient mental capacity to enter into it as the result of post-traumatic psychoneurosis and mental retardation. The court struck the reply because it felt there was insufficient evidence to submit the question to the jury.

There was evidence that plaintiff, for a time after the accident, probably suffered post-traumatic psychoneurosis of the type which made him suffer from pain for which there was no organic or physical cause. However, there was no evidence that this type of psychoneurosis would interfere with his mental capacity to enter into a contract.

In addition there was evidence that defendant was unable to read some of the more complicated words in the agreement. He had an intelligence quotient of 83, which placed him in the dull-normal range. He had finished the 8th grade at about the age of 18 but was only able to accomplish at about the 5th grade level. He had been previously employed as a driver and repairer of combines, as a mucker in a mine, as a fireman's helper on a steam turbine generator where he had to keep track of and record the readings of 12 gauges. He had been employed at his present work for about one year. He produced evidence that he was

easily influenced, was a dependent person, and that he had difficulty understanding abstract principles and complicated situations. He testified that he did not understand the provision of the contract providing that he released defendant from all claims for damages even though the provision was read and explained to him in the presence of his wife.

To have the mental capacity to contract it is necessary that a person have the ability to comprehend the nature of the transaction in which he is engaged and to understand its quality and consequences. *Coleman v. Coleman,* 85 Or 99, 103, 166 P 47 (1917) and cases cited therein. However, dullness of intellect, if it does not render the party incapable of understanding the nature and effect of his act, does not incapacitate him from making a valid contract. 2 Black, Rescission and Cancellation (2d ed) 741, § 263. The presumption is, in the absence of an adjudication of incompetence, that a person has capacity to contract. *Schultz v. First Nat. Bk. of Portland et al,* 220 Or 350, 359, 348 P2d 22 (1960).

The fact that the plaintiff was easily influenced and a dependent person, though relevant to the question of fraud and undue influence, does not prove lack of capacity to contract. Nor does plaintiff's testimony that he did not understand the contract present a jury question. The question is not whether he understood the contract but rather whether he was capable of understanding it. If a party's testimony that he failed to understand a contract was sufficient to prove that he was incapable of doing so, chaos and uncertainty would reign supreme. There is nothing particularly abstract or complex about not being able to sue one's employer for damages if a settlement is accepted. None of the experts who examined plaintiff testified

that he would be incapable of understanding such a provision. There was insufficient evidence to make a jury question on the inadequacy of plaintiff's mental capacity.

The evidence proved nothing more than that plaintiff was of normal but below average intelligence. It would be poor public policy to hold that such proof made a jury question on capacity to contract. Such a policy would be more detrimental to such persons than the occasional improvident contract they might make. If their contracts could be held void upon such proof they would be treated as incompetents by the balance of society and relegated to the class of persons with whom no one dared transact business.

The judgment of the trial court is affirmed.

LUSK, J., dissenting.

The first assignment of error, in my judgment, involves the right of cross-examination. Where there is a question of impeachment of a witness (not a party) a foundation must be laid and that cannot be done (as was attempted in this case) by exhibiting to a witness a writing which the witness neither made nor approved: *State v. Goodager,* 56 Or 198, 202-203, 106 P 638, 108 P 185. See, also, *State v. Brake,* 99 Or 310, 332, 195 P 583. Where there is no writing such as the statute contemplates and it is desired to impeach the witness by evidence of prior inconsistent statements, "the statements must be related to him, with the circumstances of times, places and persons present, and he shall be asked whether he made the statements, and if so, allowed to explain them." ORS 45.610.

This was never done. It does not follow, however, simply from the fact that a proper foundation for im-

peachment was not laid, that the court ruled correctly in declining to permit the record of the telephone conversation to be played out of the presence of the jury. I think that the majority has taken too narrow a view of the plaintiff's offer of proof. When what was said is viewed in its entirety it seems to me that counsel for plaintiff proposed that the record be played in her presence so that she could testify as to whether the voice was hers. Counsel for the plaintiff told the court just that when he said in answer to the court's question as to whether he had someone to authenticate the recording: "I don't have Mr. Goodman here, however, I believe that Mrs. Marks will be able to identify her own voice and in the event she is not able to identify it, that the jury could identify her voice from having heard her on the witness stand."

In my opinion the court should have permitted the record to be played out of the presence of the jury in accordance with this offer, and if the witness should have testified that it was her voice and her statements were accurately recorded, then, if those statements were competent evidence, the record should have been played in the presence of the jury. The right of cross-examination surely should go this far. And, of course, if anything in the recorded statement was inconsistent with the witness' testimony on the trial it would serve the purpose of impeachment to the extent of such inconsistency.

If, however, the witness in these circumstances should deny that it was a recording of her voice or should deny that statements of hers had been correctly recorded, then, there being no evidence whatever as to the circumstances of the recording or the accuracy of the instrument, I should suppose that the record

should not be played in the presence of the jury. The mere fact, however, that a part of the offer of proof went beyond what the plaintiff was entitled to should not deprive him of the benefit of that which could properly be allowed.

For the foregoing reasons I dissent from that part of the opinion of the court which holds that the trial court did not err in rejecting the offer of proof.

Mr. Justice O'CONNELL concurs in the foregoing dissent.