No. 11988

IN THE SUPREME COURT OF THE STATE OF MONTANA

1972

---

THE STATE OF MONTANA,

Plaintiff and Respondent,

-vs-

ORVILLE ARCHIE WARWICK,

Defendant and Appellant.

---

Appeal from: District Court of the Eighteenth Judicial District,
Honorable W. W. Lessley, Judge presiding.

Counsel of Record:

For Appellant:

Sandall, Moses and Cavan, Billings, Montana.
Charles F. Moses argued, Billings, Montana.

For Respondent:

Hon. Robert L. Woodahl, Attorney General, Helena,
Montana.
David V. Gliko, Assistant Attorney General, argued,
Helena, Montana.
Thomas A. Olson, County Attorney, Bozeman, Montana.
Thomas D. Gai, Deputy County Attorney, argued, Bozeman,
Montana.

---

Submitted: January 11, 1972

Decided FEB 24 1972

Filed: FEB 24 1972

<u>Thomas J. Kearney</u>
Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

This appeal is from a conviction of murder in the first degree. Defendant was tried by a jury in the district court of the eighteenth judicial district, Gallatin County, found guilty and sentenced to life imprisonment.

At about the hour of 8:30 a.m. on December 23, 1964, Mr. Earl Plum, an employee of Glacier Mountain Cheese Co., Gallatin Gateway, while traveling along Cottonwood Road, south of Bozeman, came upon the scantily clad body of a young woman. Plum immediately called the sheriff of Gallatin County, Con McClurg, and then returned to the situs of the body and blocked off the road to see that nothing disturbed the scene until the law officers arrived. Plum testified the body lay on a small bridge, clad only in a bra and panties and that a dress, slip, coat, and boots were in a pile a short distance from the body.

Sheriff McClurg, upon being notified by Plum, gathered together a number of sheriff's officers, Bozeman police officers, and the then county attorney, Page Wellcome, and proceeded to the scene arriving at about 9:40 a.m. Pictures were taken; measurements were made of the area; and plaster casts were made of tire marks. All physical evidence was analyzed by the local officials and then sent to the FBI laboratory. This physical evidence was introduced at trial, some of which will be referred to later in our discussion. A broken watch which had stopped at 4:20 and an engagement ring were on the body of the young woman.

The body was removed to a funeral home in Bozeman where Dr. Mark Young, the coroner, and Dr. Volney Steele, a pathologist, performed an autopsy at about 11:30 a.m., on December 23. Their

report shows the following: face battered and bruised, mandible fractured, fractured dislocation of left ankle, many abrasions, deformed pelvis, fractured clavicle and sternum. In their opinion the cause of death was due to "severe external trauma".

No identification of the body was made or announced to the public until between 6:00 and 6:30 p.m. the evening of December 23, when a Mrs. Mary Kuhar of Billings, Montana, arrived and identified the body as that of her daughter, Bobbi Clark.

Bobbi Clark, a graduate from Montana State University, was a teacher at Kalispell, Montana. On the evening of December 22, 1964, she drove from Kalispell to Bozeman. She was accompanied by her roommate as far as Three Forks, her roommate's home. The roommate testified that Bobbi left Three Forks at about 1:30 a.m., December 23, and her car was noted arriving in Bozeman at about the hour of 2:00 a.m. by a local police officer.

Jack Wandler, Bobbi Clark's fiancee, testified that he had expected her to stay at his apartment; that on the evening of December 22 he had cleaned the apartment and while waiting for her to arrive he had fallen asleep and had not awakened until about 6:00 a.m. Not finding Bobbi there, he called her roommate in Three Forks; made another call to a local friend of Bobbi's, a Mrs. Fulker; and then went outside where he found Bobbi's locked car parked in an alleyway parking space back of his apartment. He then went several blocks to a fraternity house to find out if his apartment mate, Jerry Sargent, had seen or heard from Bobbi, and, learning that he had not, he returned to his apartment and called the Bozeman police at 6:45 a.m.

The chief of police, Ron Cutting, answered the call; checked the parked auto belonging to Bobbi Clark; and obtained

a picture of her from Wandler. This picture was turned over to Sheriff McClurg. Chief Cutting and another officer returned to the car where they observed about a dozen footprints of a woman's shoe on the driver's side of the car which disappeared when they got to hard snow. Tire marks of another car were observed progressing up to Bobbi's car, but no casts could be made of those marks.

Plaster casts of tire tracks found near the body were sent to the FBI. On December 31, 1964, the FBI filed a report which stated that the tread design of the casts "conform most closely to the design of a Cordovan low-profile jet tire". At the time the comparison of tread designs was made, the FBI file did not contain a Crest Imperial tread design. At trial the FBI agent testified that "we just can't get every design that is made and keep up to date * * *." The FBI sent a copy of the Cordovan tread design to Sheriff McClurg to assist him in his investigation.

Prior to receiving the FBI report, the Bozeman police on December 23, initiated a survey of "every tire dealer in town" in an attempt to identify the type and make of the tire which made the tracks that the plaster casts were made from. Finally, in the early part of January 1965, a tire was located at a Gamble's store that "appeared to match the casts." That tire was a Crest Imperial. "Crest Imperial" is a trade name used on tires that are marketed only by Gamble's.

On the basis of this information Sheriff McClurg early in January advertised in the local news media that his office was seeking information "with respect to the type or kind of tire" which he believed was involved in the death of Bobbi Clark.

On January 15, 1965, a short time after the sheriff's public inquiry about the tires, the defendant reported to the Bozeman police that two tires had been stolen from his residence.

Also on January 15, 1965, one Roy Foster, while on his way home from work, found a Crest Imperial narrow white sidewall tire on the Bridger Canyon road, sometime around 4:40 p.m. The tire was found alongside the guardrail next to the road. Foster testified "it was extremely clean" and "looked as though it might have been washed." Foster stopped and picked up the tire because he had heard "ads on the radio" that the police were looking for a set of tires and "I noticed that it [the tire] hadn't been there that morning when I went to work". Foster took the tire home and called the sheriff's office. A deputy sheriff came to Foster's home and took the tire into custody. The tire had been found approximately four-tenths of a mile up the Bridger Canyon road from a fish hatchery and rock slide.

On January 18, 1965, one Alfred Kinney, while plowing snow on the Bridger Canyon road, "noticed a tire lying up on the side of the hill there at the rock slide". Kinney stopped his truck and secured the tire because he also had heard "advertising on the radio and the papers" that the sheriff was looking for tires. The tire found by Kinney was a "Crest" and "it was in good shape." Kinney turned the tire over to the sheriff's office.

Subsequent investigation established that defendant's car had had two Crest Imperial tires on it. The recovered tires were sent to the FBI laboratory to be compared with the plaster casts made at the scene where Bobbi Clark's body was found.

An FBI agent testified at the trial that the plaster casts made where the body was found and the tires located in the Bridger

Canyon area were of the same size, same tread design, and had the same degree of wear. "Further, it was either these two tires that made these two impressions or two other tires having the same characteristics as to tread size, tread size and tread design and worn in this manner, worn to this degree." These tires are a part of the circumstantial evidence that brought focus upon the defendant as a suspect.

On February 2, 1965, at the request of Burleigh Allen, a former FBI agent and a private investigator hired by Bobbi Clark's mother to assist local law officials in the investigation, defendant voluntarily, after being advised of his rights, consented to allow the local law enforcement officials and Mr. Allen to search his 1959 Chevrolet car and his apartment. This authorization went to all physical items of evidence, fingerprint analysis, and chemical identification of any substances they felt should be analyzed. With this consent, the law officers and Mr. Allen completely checked the car, taking it to a service station where it was put up on a hoist. Concerning that inspection Mr. Allen testified:

> "We noticed, I noticed, that it was extremely clean. I mean it wasn't as though it had been through mud or anything like that."

Concerning the interior of the car, he testified:

> "The interior of the car, * * * was also exceptionally clean."

On that same day, February 2, 1965, Mr. Allen, in the presence of several local law enforcement officers, took a thirty-eight page statement from the defendant concerning many facets of the investigation. This statement was taped and transcribed. In the interval between February 2, 1965, and the time of trial, some five years, the tapes disappeared.

At the trial, a state's witness, one Dick Kountz, testified that sometime in the first part of February 1965, he was out poaching deer with defendant and while in the process of dressing out a deer the defendant told him "* * * he was the one who killed Bobbi Clark". This alleged statement of defendant to Kountz did not become known to the investigating officers until nearly five years after the homicide when, for some reason not explained at the trial, Kountz gave a statement to the county attorney on January 3, 1970.

One other witness appeared at the trial who had not appeared and given testimony during the 1965 investigation. That witness was Mrs. Judith Veltkamp, who had been employed in 1964 as a grocery checker at the Buttrey Store where defendant worked as a box boy and also stacked shelves. This witness, the wife of a local police sergeant, gave the county attorney a statement in January 1970, which statement focused additional attention on defendant. She testified at the trial that between the hours of 12:00 and 12:30 p.m. on December 23, 1964, she had the following conversation with defendant at the Buttrey Store:

"A. He had come in from taking out an order of groceries and he said, 'They have just found a girl that has been drugged to death.'

"Q. What did you say? A. I said 'Drugged?' and he said 'No, dragged.'

"Q. What did you say to that? A. I said, 'Where was it?' and he said, 'On a county road.'

"Q. And what did you say? A. I asked him who it was.

"Q. What did he say to that? A. He said that it was Bobbi Clark, and I asked him if he knew her and he said yes.

"Q. While the Defendant was relating this to you, did he speak clearly? A. No.

"Q. Do you recall how he spoke? A. He, he was extremely nervous and excited.

"Q. Did he stutter at all? A. Yes, he acted like his tongue was too big for his mouth. He couldn't get the words out.

"Q. Did the Defendant relate anything else to you during this conversation? A. I asked him how he found out about this and he said, 'I heard it on the car radio when I took the lady's groceries out.'"

According to the testimony given by the coroner, the sheriff, and other investigating officers, no positive identification of Bobbi Clark was made or announced until after 6:00 p.m. that day, December 23.

Recognizing the above incriminatory facts developed against defendant at the trial, we, as was the jury, are faced with a case that is largely circumstantial. Almost five years passed between the finding of Bobbi Clark's body and the filing of an Information charging defendant with murder in the first degree. Another six months passed before defendant went to trial. We specifically note these factors because of the discrepancies in statements given during the investigation in early 1965, and those given at the trial, as well as the fact that a change of personnel had taken place in the elected officials of Gallatin County, i.e. the county attorney and sheriff.

Defendant raises six issues on appeal.

1) The court erred in not granting a continuance.

2) The court erred in that it should have disqualified itself for cause and the motion for substitution of judge should have been granted.

3) The court made prejudicial comments.

4) The evidence was insufficient to justify the verdict.

5) The admission of defendant's statement was error.

6) The court unduly limited cross-examination.

We find the controlling issue to be Issue 5, the trial court's admission into evidence of defendant's alleged voluntary statement given on February 2, 1965, which alleged statement had been taped and then transcribed. At trial, the statement was in the typewritten form. In view of our finding that such admission was prejudicial, therefore necessitating a new trial, we will focus our discussion on Issue 5, recognizing that on retrial Issues 1, 2, 3, and 4, if they are issues, ought not to arise. We will briefly comment on Issue 6 later in this opinion.

Issue 5. It is the duty of this Court to ascertain whether or not errors made at trial are prejudicial, for only upon such prejudicial errors may a case be returned to the district court for retrial. State v. Totterdell, 135 Mont. 56, 336 P.2d 696. We recognize the instant case was a most difficult one that took many days of trial and like the record of most extended trials, it could hardly be free of error. As we noted in State v. Cor, 144 Mont. 323, 340, 396 P.2d 86:

> "Our Constitutions, both Federal and State,
> guarantee a fair trial, not a perfect one."

Here, the trial judge recognized the difficulty of the question before him when he ruled to admit the statement:

> "COURT: This is a difficult question and I am well
> aware of the various cases, leading and otherwise,
> and I think the test is whether or not it was vol-
> untary and I think when you get right down to it---
> and that is what it is, because all of the niceties
> that the judges and lawyers are inclined to embroider
> the rule with, if we follow to its ultimate conclu-
> sion, perhaps no voluntary statement can ever be used

- 9 -

against an accused unless it is made in open court and maybe that is the way it should be; I am not saying that that is. Personally, I doubt it, but I think I have read this statement and at its very most it is admissions. Whether they are against interest or not, I am not at all sure about that. The ideal situation would be, as Mr. Moses indicated, the interview was taped after thorough warning and advice of all your constitutional rights and then a transcription of the interview and then a correlation between the actual tape and the interview and than a retention of the tape for verification for those such as Mr. Moses and his client. But, I suppose we have to deal with the practicalities of life and it has been a long time -- five years.

"I am going to admit it. I have thought about it quite a little bit since the noon recess and your objection may be a reversable one but I don't think so. I think this is a voluntary statement.

"Here is a man who was advised of his rights. I think it is on page 26. It sort of underlines the very thing that I have to assume without any hesitancy -- that this witness is telling the truth and he has said that he advised him of these rights and then he says farther along on the interview, almost two-thirds of the way through he said, 'Again, like we said before, you know you don't have to answer these questions ---'".

In so ruling, the court relied upon State v. Stevens, 60 Mont. 390, 199 P. 256, which held that admissions against interest are always competent without foundation. This Court has long recognized that admissions against interest are admissible, but the voluntariness of such admissions must be established. State v. Zachmeier, 151 Mont. 256, 441 P.2d 737. The "foundation" referred to in Stevens went to the voluntariness of the admission, and as such is not relevant. Here, no one testified as to the accuracy of the transcription of the tapes which were either lost or destroyed sometime between the time of the taking of the statement and the time of trial. There was no way to test the accuracy of the statement, other than the memory of Mr. Burleigh Allen, the interrogator. Mr. Allen testified he had

- 10 -

not heard the tape recording; yet some five years later he believed it to be the same.

At the time of the admission of the statement, counsel for defendant argued to the court that before such a taped interview can be admitted that:

> "* * * a person [must] testify that that taped interview was heard by him and compared with the reproduction in writing [so] that he can then be in a position to lay a foundation to say that that which appears in writing is exactly the same, letter for letter, word for word, that there have been no changes, no alterations, no mistakes, and that nothing appears but an actual accurate reproduction of that tape recording.

> "This witness has testified, of course, that he has not heard the tape recording and he just believes it is the same and we cannot tell or do not know whether there were any parts that may have been left out or any errors in the transcription and unless a foundation is laid in that respect, Your Honor, certainly we are just guessing as to its accuracy and in that respect we think no foundation has been laid."

Counsel for defendant was substantially correct in stating the law to the trial court and the court should have either required further foundation or denied the statement. Later, in defendant's cross-examination of Mr. Allen after the statement had been admitted, it was revealed: that after defendant gave the statement other interviews were had with defendant; that additions and corrections were made to the statement given on February 2; that no tapes were made of these unnumbered interviews nor do the additions and corrections made to the February 2 statement appear on the copy of the statement introduced at trial.

The state argues that even though the tape was not introduced, that the transcription was admissible as a business record, relying upon section 93-801-2, R.C.M. 1947:

"Proof of business records. A record of an act,
condition or event, shall, in so far as relevant,
be competent evidence if the custodian or other
qualified witness testifies to its identity and
the mode of its preparation, and if it was made in
the regular course of business, at or near the
time of the act, condition or event, and if, in the
opinion of the court, the sources of information,
method and time of preparation were such as to
justify its admission."

The state cites State v. Meyer, 37 Wash.2d 759, 226 P.2d
204, as authority for the admission of a typewritten statement
without the tape. Washington has a statute similar to section
93-801-2, R.C.M. 1947. Meyer is clearly distinguishable on the
facts. There, a mentally incompetent female was admitted to a
hospital where she had previously been a patient. In its regular
course of business the hospital kept clinical records of its
patents, and in the making of her record one of the staff inter-
viewed the patient some ten days after her admission. Part of
the interview of questions and answers was recorded on a Sound-
scriber and thereafter transcribed by a typist. The Soundscriber
record was destroyed. Although the typist who transcribed the
statement did not testify, one of the hospital physicians, who
had asked the questions, identified the statement as part of the
clinical record of the patient.

In Meyer, the court allowed the questions and answers to
be read as portraying the state of mind of the patient. The
Washington Supreme Court allowed the statement into evidence,
noting that the statute gave the court wide discretion and, too,
that the evidence was not a part of the state's case, but arose
on cross-examination of one of the hospital staff called as a
witness by the defendant. Such are not the facts here.

While we are not concerned with sound recordings in this
case and are concerned only with the transcript of the recording,

nevertheless we will discuss recordings generally. Sound recordings are admissible in both civil and criminal cases where the recording is both material and relevent to the issues before the court and a proper foundation is laid. That foundation must be as is set forth in 58 ALR2d 1024, Admissibility of Sound Recordings in Evidence, § 2, pp. 1027, 1028:

"The cases are in general agreement as to what constitutes a proper foundation for the admission of a sound recording. They also indicate a reasonably strict adherence to the rules prescribed for testing the admissibility of recordings, which have been outlined as follows: (1) a showing that the recording device was capable of taking testimony, (2) a showing that the operator of the device was competent, (3) establishment of authenticity and correctness of the recording, (4) a showing that changes, additions, or deletions have not been made, (5) a showing of the manner of the preservation of the recording, (6) identification of the speakers, (7) a showing that the testimony elicited was voluntarily made without any kind of inducement."

The above foundation criteria has been adhered to with minor variations in the following cases: State v. Baca, 82 N.M. 144, 477 P.2d 320; State v. Hendricks, (Mo. 1970), 456 S.W.2d 11; Parnell v. State, (Fla. 1969), 218 So.2d 535; Cummings v. Jess Edwards, Inc., (Tex. 1969), 445 S.W.2d 767; Kruse v. Coos Head Timber Company, 248 Ore. 294, 432 P.2d 1009; State v. Driver, 38 N.J. 255, 183 A.2d 655. See also 64 Harvard Law Review 1369.

The criteria for the foundation for admission of tapes or records are specific. Where a transcription is introduced along with the record, and a proper foundation has been laid for the record it will be admissible, for the transcription can be compared with the record or tape. There are some cases where only the transcription of the recording has been offered and though objected to on the basis that the transcription is not the best evidence, courts have admitted the transcription where a proper foundation was laid for the admission. Applebaum v.

Applebaum, 84 N.Y.S.2d 505 (1948); McGuire v. State, 200 Md. 601, 92 A.2d 582 (1952).

However, in State v. Baca, 82 N.M. 144, 477 P.2d 320, a police officer's notes that had been transcribed from a tape recorded interview between the defendant and the informer were held inadmissible due to failure to lay a proper foundation for both the recording itself and the subsequent transcription. That is precisely the factual situation here, except under our factual situation the tape is missing or destroyed. This loss or destruction of the tape or record has, in the few cases we have found from other jurisdictions, raised the best evidence rule objection, and where admission has been allowed it has only been after the prosecution has proven the authenticity of the transcription--that is, after laying the proper foundation as to the accuracy of the secondary evidence following the guide lines set forth in 58 ALR2d 1024, heretofore quoted.

We find the circumstances in this case clearly show the defendant's statement should not have been admitted and that prejudicial error occurred when it was admitted.

Finally, we will discuss defendant's Issue 6 which relates to defendant's contention that the trial court unduly restricted his cross-examination. Exhibit #40, Bobbi Clark's watch, had been accepted into evidence to show either the time of death or the time the body was run over out on Cottonwood Road. On cross-examination of L.D.W. Anderson, deputy sheriff at the time of the homocide, defendant's counsel asked the following question:

> "Q. Now, will you tell this court and jury whether you have been able to find any connection of that proposed exhibit #40, the watch, with Archie Warwick?"

Objection was made by the county attorney as follows:

> "MR. ANDERSON: That is objected to as invading
> the province of the court and jury and calling
> for a conclusion of this witness."

After considerable discussion between court and counsel, the objection was sustained. Upon retrial, should this question be asked, the court should permit it to be answered.

It follows from what has been said that the conviction of the defendant should be reversed and the cause remanded to the district court with instructions to grant a new trial.

It is so ordered.

_____
Associate Justice

We Concur:

_____
Chief Justice

_____

_____

_____
Associate Justices.

- 15 -